UNITED STATES, Appellee,

v.

Juan C. CRUZ, Sergeant, U.S. Army, Appellant.

No. 53,497.

CM 444468.

U.S. Court of Military Appeals.

Dec. 21, 1987.

For Appellant: *Captain David C. Hoffman* (argued); *Colonel Brooks B. La-Grua, Lieutenant Colonel William P. Heaston, Captain Craig E. Teller* (on brief); *Major Eric T. Franzen.*

For Appellee: *Captain Samuel J. Rob* (argued); *Colonel James Kucera, Lieutenant Colonel Gary F. Roberson, Lieutenant Colonel Larry D. Williams, Major Robert L. Swann, Captain Richard G. Mann, Jr.* (on brief); *Lieutenant Colonel Adrian J. Gravelle.*

*Opinion of the Court*

SULLIVAN, Judge:

On June 9, 1983, appellant was tried by a military judge sitting alone as a general court-martial at Fuerth, Federal Republic of Germany. Pursuant to his pleas, he was found guilty of one specification of possession of marijuana in the hashish form and two specifications of distribution of the same substance, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a dishonorable discharge, confinement for 16 months, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged. On appeal, the Court of Military Review dismissed the possession charge and affirmed the remaining findings of guilty and the sentence. 20 M.J. 873 (1985).

This Court granted review of the following issues:

I

WHETHER REQUIRING APPELLANT TO PRODUCE EVIDENCE SUFFICIENT TO ESTABLISH SPECIFIC PREJUDICE AND SUBSTANTIAL HARM BEFORE DEEMING THE ISSUE OF COMMAND INFLUENCE TO BE RAISED DESTROYS THE DUE PROCESS AND FAIR TRIAL PROTECTIONS OF ARTICLE 37, U.C.M.J., AND IMPERMISSIBLY SHIFTS THE BURDEN OF PROOF TO APPELLANT.

II

WHETHER THE UNUSUAL PRE-TRIAL STIGMATIZATION, SEPARATION, CONDEMNATION, AND RESTRICTION OF APPELLANT CONSTITUTED ILLEGAL PRE-TRIAL RESTRAINT AND PUNISHMENT IN VIOLATION OF ARTICLE 13, U.C.M.J.

III

WHETHER THE STAFF JUDGE ADVOCATE, BECAUSE OF HIS PRIOR INVOLVEMENT AND KNOWLEDGE OF MASS APPREHENSIONS AND

FAILURE TO TAKE CORRECTIVE ACTION, WAS DISQUALIFIED FROM PREPARING THE POST–TRIAL REVIEW.

We hold that appellant was punished prior to trial in violation of Article 13, UCMJ, 10 U.S.C. § 813, and a rehearing on sentence is required.

The facts surrounding the granted issues are fully reported in the decision below, 20 M.J. at 875–78. They are based on extra-record sworn statements offered by both parties on appeal, id. at 875 n.1, and an administrative investigation conducted pursuant to Army Regulation (AR) 15–6 (C 1, June 15, 1981).[1] A brief summary follows.

Early in 1983, the Army Criminal Investigation Command (CID) uncovered the presence of "large-scale drug abuse" at Pinder Barracks, Federal Republic of Germany. Approximately one quarter of the soldiers of the 6th Battalion, 14th Field Artillery (6/14th FA) of the Division Artillery (DIVARTY), 1st Armored Division, had positive urinalysis test results. The DIVARTY commander, Colonel Leslie E. Beavers, who also was the installation commander for Pinder Barracks, was notified of the large number of positive test results for his unit.

On March 24, 1983, Colonel Beavers held a meeting with Lieutenant Colonel (LTC) Glen D. Skirvin, Jr., battalion commander of the 6/14th FA, and LTC John Dubia, battalion commander of the 1/22d FA. He informed them of his planned mass apprehension of suspected drug abusers within DIVARTY. LTC Dubia initiated a discussion regarding removal of unit crests from the uniforms; Colonel Beavers assented to this action.

At 0630 on March 25, 1983, the battalion commanders informed their battery commanders that a mass formation was to be held that same day. Major Richard H. Witherspoon, battalion executive officer of the 6/14th FA, later stated that LTC Skirvin ordered his battery commanders and senior non-commissioned officers to remove the unit crests from the arrestees identified at the formation. Moreover, the procedure to be used at the formation was also established at this time. When a soldier's name was called, he would be escorted by his battery commander and first sergeant to the platform situated at the front of the formation. Once in front of the platform, the soldier's unit crests would be removed from his uniform by his escorts. He would then salute Colonel Beavers and await further instructions.

At 0800 on March 25, 1983, the formation was held. Approximately 1,200 soldiers were present. (*See* Appendix 1.) Colonel Beavers began speaking about trust and how that trust had been betrayed by members of the assembled unit. As he spoke, German Polizei and Army military police entered the base and took stations around the formation. Then, Colonel Beavers began calling the names of the suspected drug abusers. Approximately 40 soldiers, including appellant, were called out of the formation. As previously arranged, the soldiers were escorted to the platform, whereupon the majority of the soldiers had their unit crests removed. They saluted, but Colonel Beavers failed to return the salutes. The Court of Military Review assumed for purposes of its decision that, severally or jointly, the assembled collection of soldiers were called "bastards" or "criminals" or both by Colonel Beavers. This assembled collection was then marched to an adjacent site where the soldiers were individually searched and handcuffed by CID agents, in full view of the soldiers remaining in the formation. (*See* Appendix 2.)

These soldiers were then transported to the CID office for questioning. After being questioned by the CID, the soldiers were returned to their units. Thirty-five arrestees were members of the 6/14th FA. These soldiers, including appellant, were

---

**1.** A post-trial hearing similar to that ordered in *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), is the preferred method for dealing with these matters. *See United States v.* *Levite,* 25 M.J. 334 (C.M.A.1987); *United States v. Karlson,* 16 M.J. 469, 474 (C.M.A.1983).

then billeted separately from their unit. After preferral of charges, they were given the opportunity to return to their individual barracks, but twenty-seven elected to remain separate. They were given or adopted the name "Peyote Platoon." This "unit" assembled separately from the battalion in subsequent formations and allegedly marched to the cadence of "peyote, peyote, peyote." Of these soldiers, fourteen were tried by general court-martial and one by a BCD special court-martial; eleven were tried by summary court-martial; five were given nonjudicial punishment; and four received administrative discharges in lieu of trial.

No assertion of command influence or prior punishment was made by appellant at his court-martial. However, 4 months after his trial, he complained that the activities described above induced him to accept a pretrial agreement for 16 months' confinement. On December 12, 1983, Brigadier General H.L. Olson was appointed to investigate the circumstances surrounding appellant's complaint. In his report dated December 20, 1983, General Olson concluded that Colonel Beavers' actions "cast a taint over some levels of subsequent legal proceedings" and recommended rehearings in the summary courts-martial and the nonjudicial- punishment cases. The Commanding General, VII Corps, substantially agreed but ordered review of these proceedings on a case-by-case basis. This investigation was later released to the Court of Military Review. Finally, on February 7, 1984, Major General Crosbie E. Saint, Commander of the 1st Armored Division, issued a directive which prohibited the above-noted conduct and strictly limited use of mass apprehensions.

I

■ The first issue in this case was decided by *United States v. Thomas*, 22 M.J. 388, 393–94 (C.M.A.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). In the language of that decision, we are "persuaded beyond a reasonable doubt that the findings" of guilty were not "affected by the command" action taken in this case. *Id.* at 394.

In this regard, we note that the command influence (Art. 37, UCMJ, 10 U.S.C. § 837) exercised (Art. 98, UCMJ, 10 U.S.C. § 898) or attempted to be exercised (Art. 80, UCMJ, 10 U.S.C. § 880) in this case was directed at ensuring that appellant and his fellow soldiers in the "Peyote Platoon" received severe punishment. Although such unprofessional conduct reflected the obvious view of certain officers that these soldiers were guilty of drug offenses, there was no direct or indirect attempt to orchestrate the findings portion of their courts-martial. *Cf. United States v. Levite*, 25 M.J. 334 (C.M.A.1987). Moreover, appellant pleaded guilty to the charged offenses, and he makes no particular complaint that his defense on the findings was in any way impaired. In this context, the findings of guilty may be affirmed. *See United States v. Thomas, supra.*

Concerning the punishment in this case, we have grave doubts whether the sentence hearing in this case was fair. *See United States v. Brice*, 19 M.J. 170 (C.M.A. 1985). However, as noted below, we need not order a rehearing on sentence in this case for this reason alone.

II

■ The second question raised on this appeal is whether the treatment afforded appellant prior to his court-martial amounted to unlawful punishment prohibited by Article 13. The Court of Military Review held that appellant waived this issue by failing to raise it at his court-martial. 20 M.J. at 892–93. *Compare United States v. Palmiter*, 20 M.J. 90, 96 (Cox, J., lead opinion) *with* 100 (Everett, C.J., concurring in the result). We note, however, that the post-trial materials which first raised this issue also suggest that there may have been a subrosa agreement between the staff judge advocate and defense counsel to prevent its litigation. *Cf. United States v. Jones*, 23 M.J. 305 (C.M.A.

1987). Moreover, a *DuBay*[2] hearing was not ordered in this case by military authorities to resolve these post-trial questions. *See United States v. Levite, supra.* Finally, the failure to raise the issue of pretrial punishment at the court-martial, absent some properly disclosed sentence consideration, comes perilously close to inadequate representation by counsel. *See generally United States v. Scott,* 24 M.J. 186 (C.M.A. 1987). Accordingly, a finding of a valid waiver in these circumstances is unwarranted.

■ Turning to the pretrial punishment issue in this case, we are convinced that appellant's treatment on the parade ground and as a member of the so-called "Peyote Platoon" violated Article 13. *See generally United States v. Bayhand,* 6 U.S.C.M.A. 762, 770, 21 C.M.R. 84, 92 (1956). This codal provision states:

§ 813. Art. 13. Punishment prohibited before trial

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances require to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

In determining whether the treatment afforded appellant was a punishment or penalty for purposes of this provision, recourse to the military experience is particularly helpful.

Colonel Winthrop, in his work *Military Law and Precedents* 434 (2d ed. 1920 Reprint), stated the following in this regard:

*Discharge with ignominy.* A mode of dishonorable discharge, sanctioned by usage for time of war, *is drumming,* (or bugling,) *out of the service,* with the "Rogue's March," *in the presence of the command.* This ignominious form is sometimes conjoined with circumstances of special ignominy. *Thus soldiers have* *been sentenced to be drummed out after having their clothing stripped of all military insignia,* or after being tarred and feathered, or with their heads shaved or half-shaved, or with straw halters around their necks, or bearing placards inscribed with the names of their offences.

(Some emphasis added; footnotes omitted.) He also described the disused punishment of placarding as follows:

*Standing or marching for a certain time bearing a placard or label inscribed with the name of the offence* —as "Deserter," "Coward," "Mutineer," "Marauder," "Pillager," "Thief," "Habitual Drunkard" was at one time a not uncommon punishment. In some cases the inscriptions were more extended—as "Deserter: Skulked through the war;" "A chicken-thief;" "For selling liquor to recruits;" "I forged liquor orders;" "I presented a forged order for liquor and got caught at it;" "I struck a noncommissioned officer;" "I robbed the mail—I am sent to the penitentiary for 5 years;" "The man who took the bribe from deserters and assisted in their escape."

*Id.* at 441–42 (emphasis added; footnotes omitted).

■ An historic example of this type of military punishment, although from another country, was the public ignominy or ceremony of degradation imposed on Captain Dreyfus. *See* J. Bredin, *The Affair: The Case of Alfred Dreyfus* 3–8 (J. Mehlman trans.) (George Braziller Inc., New York, 1986). Of course, even the alleged traitor Dreyfus was not subjected to this treatment until *after* he had undergone a trial by court-martial, albeit a highly irregular one. Clearly, public denunciation by the commander and subsequent military degradation before the troops prior to courts-martial constitute unlawful pretrial punishment prohibited by Article 13. *See* paras. 18*b* (3) and 125, Manual for Courts-Martial, United States, 1969 (Revised edition); *Winthrop, supra* at 124–25. The

---

**2.** *See* n. 1, *supra.*

treatment appellant suffered was substantially the same.

Military authorities subsequent to appellant's court-martial frankly recognized that his pretrial treatment violated Article 13. Brigadier General Olsen, the AR 15–6 investigating officer, and Lieutenant General Galvin, Commander of VII Corps, who ordered the investigation of appellant's post-trial complaint, had no difficulty in finding that the conduct of the Brigade Commander violated or probably violated this codal provision. Moreover, a directive was issued shortly thereafter advising commanders that mass apprehensions conducted under these circumstances were unlawful and prohibited.[3]

 We agree[4] and hold that a new sentence hearing must be ordered so appellant can bring this prior punishment to the attention of his court-martial. *See* para. 75

*c*(1)(b), Manual, *supra; see also United States v. Suzuki,* 14 M.J. 491, 493 (C.M.A. 1983).

### III

The third granted issue in this case asks whether the staff judge advocate was disqualified from preparing the post-trial review in this case. *See* Art. 6(c), UCMJ, 10 U.S.C. § 806(c). Appellant asserts that the staff judge advocate's knowledge of the mass apprehension practice and his alleged attempts to "cover it up" constitute such a disqualification. *See generally United States v. Engle,* 1 M.J. 387, 389 (C.M.A. 1976). Such a question we need not answer in the present case.

 The relief we order today, a rehearing on sentence, will in turn necessitate a new post-trial review by a successor staff judge advocate on the sentence which

---

**3.** Major General Crosbie E. Saint, Commanding General, 1st Armored Division, issued a letter on mass apprehensions on February 7, 1984. He stated *inter alia:*

\* \* \* \* \* \*

4. *Policy: The presumption of innocence is one of the principles our Armed Forces exist to defend. The apprehension of soldiers suspected of misconduct in any manner designed to humiliate, ridicule or harass them is inconsistent with that principle and will not be tolerated.* Accordingly, the following policies apply within this jurisdiction:

a. A mass apprehension may be conducted only when essential, legitimate law enforcement interests warrant the use of this apprehension technique. Legitimate law enforcement interests may include the number of suspects to be apprehended; the number of police personnel available to assist in the apprehensions; the time available to conduct the apprehensions; and the need to apprehend a number of individuals simultaneously.

b. *The use of mass apprehensions as a deterrent to others or to humiliate, ridicule or otherwise act contrary to the inherent dignity of the American soldier is forbidden.*

c. No mass apprehensions may be conducted within the general court-martial jurisdiction of the Commander, 1st Armored Division, without the express approval of either the Commander or Chief of Staff, 1st Armored Division. Before requesting permission to conduct a mass apprehension the commander concerned will coordinate the proposed apprehension with the Staff Judge Advocate, 1st Armored Division.

5. *Prohibitions:* The following is not permitted incident to apprehensions in this jurisdiction:

a. *Removal of any unit crest, insignia, award or any item of clothing unless necessary for the protection of the accused or other personnel.*

b. Unnecessary public identification of an apprehended person as a criminal suspect.

c. *Scheduling either the time, location, or method of conducting an apprehension for the purpose of publicly exposing the apprehended individual.*

The above prohibitions are not an exclusive listing of any illegal and improper apprehension procedures. No actions inconsistent with the policy statement in paragraph 4 are permissible.

(Emphasis added.)

**4.** The suggestion by government appellate counsel that such treatment is not punishment because it was intended to curb the unit drug problem is somewhat specious. *See United States v. Harper,* 22 M.J. 157, 164 (C.M.A.1986). Under this rationale, Article 13, Uniform Code of Military Justice, 10 U.S.C. § 813, would not be violated even if these arrestees had been shot or flogged, so long as its ultimate purpose was to benefit the unit as a whole. *Cf.* Art. 55, UCMJ, 10 U.S.C. § 855. Clearly the reasonableness of the conduct designed to secure the nonpunitive government objective must also be considered. *Cf. United States v. Palmiter,* 20 M.J. 90, 99 (Everett, C.J., concurring in the result.) *See* also n. 3, *supra.*

might be imposed. *See* para. 85 *b*, Manual, *supra.* Since appellant pleaded guilty and we can find no link between his decision to plead guilty and his pretrial treatment, we conclude a new review on findings is not necessary. Nevertheless, our reluctance to grant this relief in full should not be construed as approval of the staff judge advocate's conduct in this case. *See generally United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

### IV

The decision of the United States Army Court of Military Review is reversed as to sentence, and the sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on sentence based on the approved findings may be ordered.

Chief Judge EVERETT and Judge COX concur.

### APPENDIX 1