**UNITED STATES, Appellee,**

v.

**Specialist Brian P. HATCHELL, 564–73–6828, United States Army, Appellant.**

**ACMR 9002714.**

U.S. Army Court of Military Review.

25 Oct. 1991.

---

**840**

For Appellant: Captain Jay S. Eiche, JAGC, Captain Cynthia J. Rapp, JAGC (on brief).

For Appellee: Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Captain Kenneth T. Grant, JAGC (on brief).

Before De GIULIO, HAESSIG, and ARKOW, Appellate Military Judges.

## OPINION OF THE COURT

De GIULIO, Senior Judge:

Appellant was tried by a military judge sitting as a general court-martial. Consistent with his pleas he was found guilty of use of marijuana and two specifications of distribution of marijuana in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a (1982 & Supp. V 1987) [hereinafter UCMJ]. He was sentenced to a bad-conduct discharge, confinement at hard labor for thirty months, forfeiture of $580.00 pay per month for thirty months, and reduction to Private E1. Pursuant to a pretrial agreement, the convening authority reduced the confinement to twelve months and one day but otherwise approved the sentence.

Before this Court, appellant alleges that the convening authority erred by approving forfeitures in excess of two-thirds pay per month for the period appellant is not confined. We agree and will take corrective action. *See United States v. Warner*, 25 M.J. 64 (C.M.A.1987); *United States v. Hicks*, 26 M.J. 935 (A.C.M.R.1988).[1]

This court specified the following issues:

1. We also note that the military judge sentenced appellant to, and the convening authority ap-

## I.

WHETHER APPELLANT IS ENTI-TLED TO SENTENCE CREDIT FOR UNLAWFUL PRETRIAL PUNISH-MENT RESULTING FROM THE MAN-NER OF HIS APPREHENSION? *UNITED STATES V. CRUZ*, 25 M.J. 326 (C.M.A.1987).

## II.

WHETHER THE MILITARY JUDGE ERRED DURING THE PRE–SEN-TENCING PORTION OF APPEL-LANT'S TRIAL IN INQUIRING INTO APPELLANT'S POTENTIAL FOR FUR-THER MILITARY SERVICE? *SEE UNITED STATES V. OHRT*, 28 M.J. 301 (C.M.A.1989).

We find error concerning each of the specified issues but find no prejudice to appellant.

## I.

Appellant was identified by a soldier working for the Criminal Investigation Command (CID) as a user and distributor of hashish. After obtaining hashish in Frankfurt, Federal Republic of Germany, appellant returned to his barracks. In his barracks room on 1 August 1990, appellant sold three grams of hashish to a CID undercover agent. Appellant also smoked a hashish cigarette in the presence of the CID agent and handed the cigarette to his roommate who also smoked it.

Agent Esther Harwell, special agent in charge of the local CID office, decided to conduct a mass apprehension of several suspected drug users and distributors, many of whom were suspected of being involved in related cases. At the 0600 physical training formation on 6 August 1990, appellant and two other soldiers were told to fall out to the rear of the formation where CID agents and a military policeman were waiting to apprehend the soldiers. Appellant was taken to the side of the battery where he was frisked and placed in handirons. A stipulation of fact indicates appellant's apprehension was in view of the soldiers who were in formation. Appellant was placed in a police car, taken to the police station and subsequently released. Appellant testified at trial that the apprehension subjected him to considerable ridicule among other soldiers of his unit. Appellant stated, "I was—had like a stigma put on me ... in my unit. Certain people who had spoken to me before would no longer speak to me and I was treated as though I was already a criminal...."

At trial, Special Agent Harwell testified that the mass apprehension was her idea. She stated that the CID had information that appellant and other soldiers were going to Amsterdam prior to 6 August to bring back controlled substances. She stated that it was necessary to apprehend them all as soon as possible and at the same time so the drugs would not be distributed, so they would not know the CID was involved, and so they would not cease their activities. She stated, however, that a substantial number of soldiers who were to be apprehended were absent because their unit was in Crete. She testified that it was common practice to make all apprehensions at the same time and that there was compliance with the standard operating procedure.[2]

---

proved, "confinement at hard . labor." The words "at hard labor" should be omitted in a sentence to confinement. Manual for Courts-Martial, United States, 1984, Rule for Courts-Martial 1003(b)(8) discussion.

**2.** Criminal Investigation Command Regulation 195–1, Criminal Investigation: CID Operations, para. 3–2c (1 November 1986), provides:
Mass Apprehensions. Mass apprehensions have the potential for abuse and should be utilized only when a valid and legitimate investigative purpose can be documented (e.g. danger to informants, potential for collusion among subjects, probability of flight). If used, CID agents will not utilize techniques intended to subject those apprehended to public ridicule, and will encourage commanders to refrain from similar techniques. Specific techniques to be avoided include removal of unit insignia, public statements to the effect that those apprehended are criminals (as opposed to suspects/subjects), or use of force in excess of that needed to effect the apprehension. Prior coordination with the CID supervisor, the commander and trial counsel is strongly encouraged.

In *United States v. Cruz*, 25 M.J. 326 (C.M.A.1987), a mass apprehension [3] before a unit formation was held to constitute public denunciation and military degradation prohibited by Article 13, 10 U.S.C. § 813. Several facts were present in *Cruz* which are not present in this case. In *Cruz*, the commander failed to return the soldiers' salute when they reported to him in front of the formation. In addition, he called them "criminals and bastards." The soldiers' unit crests were removed from their uniforms. Like the case before us, the soldiers were taken to an adjacent site, searched and handcuffed, in view of the soldiers remaining in the formation.

▮ An apprehension of soldiers from a formation need not involve the extraordinary aggravating circumstances which were present in *Cruz* in order to violate Article 13, UCMJ. A posting of a serious incident report of drug offenses at a soldier's place of duty has been held to be a form of public denunciation and military degradation prohibited by Article 13. *United States v. Villamil–Perez*, 32 M.J. 341 (C.M.A.1991). Even when a nonpunitive governmental purpose is present, Article 13 may be violated. *See Cruz*, 25 M.J. at 331 n. 4.

Government counsel, citing *United States v. James*, 28 M.J. 214, 216 (C.M.A.1989), contends the complained-of conditions were rationally related to reasonable operating procedures and were not so excessive to rise to the level of punishment. We must examine the reasonableness of the conduct and the intent behind its use. *See Cruz*, 25 M.J. at 331 n. 4; *United States v. James*, 28 M.J. 214, 216 (C.M.A.1989), *citing Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

▮ In appellant's case, the investigative purpose for the mass apprehension was not documented.[4] Our concurring brother referred to Agent Harwell's testimony on the need to stop the distribution of drugs some soldiers obtained from Amsterdam. The record contains no evidence of appellant's involvement in such a distribution scheme, except for the agent's statement. Indeed, appellant was never charged with any offense concerning such a scheme. The facts here do not demonstrate a legitimate purpose behind the public apprehension of appellant from the formation.

In addition, the testimony of Agent Harwell is inconsistent. On the one hand, she testified that the need was to apprehend suspected drug distributors at the same time. On the other hand, she testified that all the suspects could not be apprehended at the same time because their unit was in Crete. Further, our review of court-martial cases leads us to the conclusion that mass apprehensions from unit formations are not common practice, contrary to her testimony. These inconsistencies cause us to give less credence to her stated purpose for the necessity of the mass apprehension from the formation.

We find as a matter of fact from the evidence before us that at least part of the underlying purpose was public denunciation. *See* UCMJ art. 66(c), 10 U.S.C. § 866(c). Our view of the matter was best expressed by General Crosbie E. Saint, then Commanding General, 1st Armored Division, when he stated, "The use of mass apprehensions as a deterrent to others or to humiliate, ridicule or otherwise act contrary to the inherent dignity of the American soldier is forbidden." *Cruz*, 25 M.J. at 331 n. 3. Simply put, we don't treat soldiers that way. Under these circum-

---

3. The term "mass apprehension" is a misnomer. The conduct found offensive in *Cruz* was the apprehension of soldiers in formation and their public humiliation. The same analysis may apply even if only one soldier is apprehended or punished in that manner.

4. Such documentation was required by the applicable CID regulation. *See supra* note 2. Be-

cause of the possibility of violations of Article 13 even when a government purpose is present, we suggest that the CID regulation be changed to require staff judge advocate coordination prior to mass apprehensions. Investigators, commanders, and staff judge advocates should be aware that this Court closely scrutinizes mass apprehensions for violations of Article 13.

stances, we find a violation of Article 13, UCMJ.

 Not all violations of Article 13, UCMJ, require a drastic remedy. *Villamil–Perez*, 32 M.J. at 344. In accordance with a pretrial agreement, the convening authority substantially reduced the period of confinement. Consequently, considering the circumstances of this case, we conclude that appellant suffered no substantial prejudice as a result of his illegal pretrial punishment.

## II.

During the pre-sentencing portion of this trial by military judge alone, a sergeant who worked with appellant on a daily basis testified that, "I think with proper help [appellant] can be rehabilitated." The military judge asked the witness several questions, to include the following: "Do you think that he could be rehabilitated in the sense that he could make a useful, continuing contribution in the service?" The witness answered, "No sir." Counsel objected to the question based upon *United States v. Ohrt*, 28 M.J. 301 (C.M.A.1989). The military judge asked to see the *Ohrt* case. Later in an Article 39(a), UCMJ, session he stated:

> Counsel, I have read *Ohrt*. I understand the point that you're making. I will not take the statement of the sergeant as indicating a comment that he should be discharged. I will only treat his comment as indicating that he doesn't believe that he has any rehabilitative potential for further military service, whatever that may mean, because that's the context in which I understood him to take it. Quite honestly, the way the questioning developed, a large part of it was developed by the defense by going into the question of rehabilitation. My specific question was to determine what he meant by rehabilitation. Okay? So, within the bounds of what you're asking, I'm going to sustain your objection in the sense that I'm not going to treat that as a demand and I will not consider that the sergeant is indicating that in his opinion he should be discharged. But I'm taking

it as an indication he has serious doubts as to whether or not he can be rehabilitated for further military service, whatever that means within the context of this case. Do you understand? I understand the point that you're making. It is a fine distinction and I'm not sure how workable that is. I would note that there is a fairly significant decent [sic] in that case also. So that's going to be my ruling. I think I'm capable of factoring in all the proper considerations that have to be applied here. Okay?"

In *United States v. Horner*, 22 M.J. 294, 296 (C.M.A.1986), the Court of Military Appeals adopted an expansive definition of rehabilitation potential consistent with a return to a particular status and a return to society in general. This view was adopted "because the sentencing function encompasses more than the question of whether an accused should be restored to duty." *Id.* at 296. The Court of Military Appeals has strongly condemned euphemisms such as "no potential for continued service," because they are designed to tell the court to sentence an accused to a punitive discharge. *United States v. Ohrt*, 28 M.J. 301 (C.M.A.1989). Thus, this Court has suggested:

> Assuming a proper foundation has been established for the witness to give a "rationally based" opinion on the accused's rehabilitative potential, the proper question to elicit that opinion is: "In your opinion, does the accused have rehabilitative potential?"; the proper response, dictated of course by the witness' opinion is "yes" or "no." Any reference by the witness to a discharge, separation from the service, or lack of potential for continued service should be scrupulously avoided. *See Ohrt*, 28 M.J. at 304–07."

*United States v. Stimpson*, 29 M.J. 768, 770 n. 2 (A.C.M.R.1989).

 In the case before us, although trial defense counsel attempted to follow *Stimpson*, the military judge solicited an improper answer by his question, "Do you think he could be rehabilitated in the sense that he could make a useful, continuing contribution in the service?" We see little differ-

ence between getting a "no" answer to this question and the euphemisms condemned in *Ohrt*. It was error for the military judge to ask the question.

■ This case was tried by a military judge alone. In sentencing an accused, a military judge is presumed to know what he can consider absent a showing to the contrary. *United States v. Razor*, 41 C.M.R. 708 (A.C.M.R.1970). Although the military judge's comments may be a showing to the contrary, his later statement, after reading *Ohrt*, leads us to conclude that he did not consider the question and the response in arriving at the sentence. We find no prejudice to appellant. *See Horner*, 22 M.J. at 296; *Stimpson*, 29 M.J. at 770.

The findings of guilty are affirmed. Only so much of the sentence is affirmed as provides for a bad-conduct discharge, confinement for twelve months and one day, forfeitures for $480.00 pay per month for twelve months, and reduction to Private E1.

Judge HAESSIG, concurs.

ARKOW, Judge (concurring in the result):

I concur in the result. However, I do not agree with the majority's finding of error with respect to the alleged violation of Article 13, Uniform Code of Military Justice, 10 U.S.C. § 813 (1982) [hereinafter UCMJ]. I believe there was no error.

At an Article 39(a) session, appellant moved for appropriate relief, seeking a thirty-day credit for any confinement that may be adjudged as a result of his court-martial. He claimed that his apprehension with two other soldiers from his unit was a "mass apprehension" tantamount to punishment before trial in violation of Article 13, UCMJ. After an evidentiary hearing on the motion the military judge concluded that the apprehension was proper and it did not violate the appellant's rights under Article 13, UCMJ.

The facts surrounding the apprehension are not in dispute. At a regularly scheduled 0600 physical training formation con-

sisting of from 20 to 50 soldiers, appellant and two other soldiers were directed by Sergeant First Class Moss, who was standing to the front and center of the formation, to fall out to the rear of the formation. Appellant proceeded to a point thirty feet to the rear and side of the formation and was apprehended, frisked, placed in irons, and then taken away from the area. While the apprehension was taking place, the soldiers in the formation were facing away from appellant and participating in physical training. The apprehension lasted about three minutes.

Appellant testified that some soldiers in the formation observed the apprehension. Later in the day, after his release from custody, his fellow soldiers asked him about the apprehension. Appellant indicated that he felt he was already found guilty, was embarrassed, and was being punished before trial because some soldiers refused to speak to him and treated him as a criminal. However, he indicated that he was not placed on restriction or treated differently from any other soldier by his chain of command.

Special Agent Esther Harwell planned what was called a "mass apprehension." She indicated that on the morning of 6 August 1990 two soldiers were apprehended with the appellant. At about the same time three or four soldiers from another battalion located on the same Kaserne were also apprehended. Her rationale for the apprehension was:

... [O]ne of my drug suppression team members had had conversations with Specialist Hatchell. We had information that he and other soldiers were going to Amsterdam that weekend prior to the 6th. We knew they weren't returning until the early morning hours of the 5th or 6th. We had reason to believe they were going to bring back controlled substances from Amsterdam. We coordinated with all the company commanders involved and told them that we wanted to conduct the apprehensions as soon as possible upon their return. The earliest time would have been that morning formation.... [It was important to do it

then] because if they had brought back controlled substances, we wanted to get those before they were distributed.[1]

Agent Harwell conceded that she could have conducted the apprehension differently but contended that it was common practice for her to make apprehensions in related cases at the same time.[2]

Judge Ecker, after hearing Agent Harwell's testimony and evaluating her demeanor, concluded that, while there were other alternatives, the apprehension did serve a "legitimate government or law enforcement purpose." He found that no aspect of the apprehension aggravated the embarrassment that would accompany any apprehension observed by others and that the appellant was not singled out for "increased treatment or mistreatment" (in connection with the placement of the hand-irons). Also, he found there was no intent to punish the appellant before trial. Accordingly, the military judge denied the defense motion.

The facts in this case are only remotely similar to those in *United States v. Cruz,* 25 M.J. 326 (C.M.A.1987). In that case there was a carefully conceived plan to hold a formation of all the units on the installation for the sole purpose of apprehending forty suspected drug offenders.[3] In all there were thirteen company-sized units consisting of about 1200 soldiers. While the installation commander addressed the formation on the evils of drug use, police surrounded the formation and the names of the suspected drug abusers were announced. These soldiers were then escorted to the front of the formation where they were publicly humiliated and transported from the area by the military police in a manner reminiscent of an old western movie. After their release from custody they were segregated from other members of their unit and continued to be treated in a publicly humiliating manner until the cases reached their conclusion.

The Court of Military Appeals in *United States v. Palmiter,* 20 M.J. 90 (C.M.A.1985) took cognizance of the Supreme Court's decision in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). They noted:

[T]hat the question of whether particular conditions amount to punishment before trial is a matter of intent, which is determined by examining the purposes served by the ... conditions, and whether such purposes are 'reasonably related to a legitimate governmental objective.... [I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective.

*Id.,* 20 M.J. at 95.

Here, appellant was only subjected to the incidental rather than planned humiliation that is associated with nearly every public apprehension, be it in the barracks, on the street, or in an office. Manual for Courts-Martial, United States, 1984, Rule for Courts-Martial 302 generally does not restrict where an apprehension may be made. This case is far different from the premeditated action of the commander in *Cruz.* This case is also different than *United States v. Villamil-Perez,* 32 M.J. 341 (C.M.A.1991), where a supervisor posted a Serious Incident Report on a unit bulletin board in a formal manner highlighting an accused's involvement in a drug offense prior to trial, subjecting him to denunciation and military degradation in violation of Article 13, UCMJ. Agent Harwell's actions

---

1. There is no evidence in the record that a search was conducted as a result of the information that the appellant may be bringing back drugs from Amsterdam. It is not unusual for information supplied to police to prove to be unproductive. Unfounded leads do not mean there was an illegitimate police purpose. The appellant was apprehended for an earlier drug distribution which was the subject of this court-martial. This was the only testimony as to the reason for the apprehension and "documents" the reason for Agent Harwell's decision.

2. Contrary to the majority's belief, I cannot disagree with her conclusion that such apprehensions are a common practice.

3. A more detailed discussion of the facts in *Cruz* is found at 20 M.J. 873, 875 (A.C.M.R.1985).

were reasonable and were related to a legitimate governmental objective, i.e., the apprehension of drug suspects in related cases. *See United States v. James*, 28 M.J. 214, 216 (C.M.A.1989), *citing Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

I also endorse the comments of General Saint quoted by the majority but point out that both CID Regulation 195–1 (note 2 of the majority opinion) and General Saint's policy letter recognize that mass apprehensions serve a legitimate law enforcement purpose. *Cruz*, 25 M.J. at 331 n. 3.

The majority concluded that Agent Harwell's testimony was inconsistent on whether there was a need to apprehend all the suspects at the same time because the apprehension took place while some of the suspects were in Crete on a military exercise. I disagree. She justified the need to apprehend those who just returned from Amsterdam. That need, it would seem, logically outweighed her preference to wait for the other suspects to return from Crete. I do not believe it follows that her failure to wait shows part of the underlying purpose of the apprehension was public denunciation. Further, I cannot conclude from the evidence at trial, that Agent Harwell intended to punish appellant prior to trial. Rather I find that her action was "an incident of a legitimate nonpunitive governmental objective." *Bell v. Wolfish*, 441 U.S. at 539, 99 S.Ct. at 1874.

Accordingly, I conclude that the military judge properly declined to find a violation of Article 13, UCMJ.