**UNITED STATES**

v.

**Senior Airman MARCUS L. STARR,
United States Air Force.**

**ACM S29510.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 19 Nov. 1997.

Decided 16 July 1999.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt, Major Margo Stone Newton, and Major Stephen P. Kelly.

Appellate Counsel for the United States: Colonel Anthony P. Dattilo, Colonel Michael J. Breslin, and Major Bruce T. Smith.

Before YOUNG, Senior Judge, SPISAK, and SCHLEGEL, Appellate Military Judges.

## OPINION OF THE COURT

YOUNG, Senior Judge:

The appellant pled guilty to, and was convicted of, two specifications of larceny and one specification of housebreaking. Articles 121, 130, UCMJ, 10 U.S.C. §§ 921, 930. The military judge also convicted the appellant of dishonorably failing to pay a debt. Article 134, UCMJ, 10 U.S.C. § 934. The military judge sentenced the appellant to a bad-conduct discharge, confinement for 4 months, and reduction to E–1. The appellant asserts two errors: (1) The evidence is legally and factually insufficient to support the dishonorable debt conviction; and (2) The military judge erred by denying his motion for confinement credit because of illegal pretrial punishment. We agree with the appellant's first assignment of error and will modify the findings and sentence.

### I. Legal and Factual Sufficiency

#### A. Facts

In October or November 1996, the appellant, a member of the Security Forces (SF) Squadron at Osan Air Base, Korea, began dating Ms. Barnwell. During their first meeting, he told Ms. Barnwell that he was divorced, although he was married. In December, the appellant falsely told her that he faced punishment, under Article 15, UCMJ, if he did not pay his delinquent child support obligation. He explained that he had borrowed money from friends, but still needed about $800. Ms. Barnwell offered to lend him the money. After initially refusing, the appellant accepted the offer. Ms. Barnwell sold some of her jewelry for $500, withdrew another $460 from her bank account, and gave the money to the appellant. The appellant offered to sign a note for the money, but Ms. Barnwell insisted that his word was good enough. No specific payment schedule was set. The appellant told her he would pay her back in installments or when he received his tax refund from an art store he owned. When Ms. Barnwell telephoned the appellant three days later, he told her that his friend's check had bounced, and he needed more money. She withdrew $250 from her account and gave it to the appellant.

After receiving this money, the appellant lost interest in Ms. Barnwell. The couple had planned to spend her birthday, 28 December, and New Year's Eve together, but the appellant neither telephoned nor went to see her. On New Year's Day, Ms. Barnwell saw the appellant with another woman and asked him to meet with her to discuss the loan. The appellant agreed to meet her an hour later in the Mustang Club. Ms. Barnwell saw the appellant at the club, but he disappeared before she could talk to him.

On 8 January 1997, Ms. Barnwell telephoned the appellant again and asked him when he planned to pay her back and when they could meet to discuss installment payments. The appellant told her that 15 January would be convenient because it was payday. When Ms. Barnwell called on the 15th, the appellant's roommate told her the appellant was on emergency leave. In fact, he was on ordinary leave, which he had requested on 6 January, prior to arranging the meeting with Ms. Barnwell for the 15th.

Ms. Barnwell telephoned the appellant's first sergeant seeking help in collecting the debt. When the appellant returned from leave, the first sergeant questioned him about the debt. At first, the appellant ap-

peared not to know who Ms. Barnwell was. After admitting he knew her, he disputed the amount of money he received from her and whether it was a gift or a loan. After leaving the first sergeant's office, the appellant telephoned Ms. Barnwell at her workplace. She could not talk at that time, but agreed to telephone him when she got off work. Before calling him, Ms. Barnwell telephoned the first sergeant, who advised her not to return the call. Ms. Barnwell telephoned the appellant and, based on the first sergeant's advice, told him that she could not (would not) meet or speak with him. Thereafter, Ms. Barnwell did not speak or correspond with the appellant.

### B. The Law

■ We may affirm only those findings of guilty which we determine to be correct in law and fact and on the basis of the entire record should be approved. Article 66(c), UCMJ, 10 U.S.C. § 866(c). The test for legal sufficiency is whether, when the evidence is viewed in the light most favorable to the government, a reasonable fact-finder could have found the appellant guilty of all elements of the offense, beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The test for factual sufficiency is whether, after weighing the evidence and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

The elements of the offense of dishonorable failure to pay a debt are as follows: (1) That the accused was indebted to a certain person in a certain sum; (2) That this debt became due and payable on or about a certain date; (3) That while the debt was still due and payable the accused dishonorably failed to pay it; and (4) That, under the circumstances, the accused's conduct was to the prejudice of good order and discipline or service discrediting. *Manual for Courts-Martial, United States (MCM)*, Part IV, ¶71b (1998 ed.).

### C. Discussion

■ The appellant contends that the evidence against him is insufficient to support a conviction because there is a controversy as to the amount of the debt and there was no date certain on which the debt became due and payable. Ms. Barnwell's testimony clearly established that she loaned $1,210 to the appellant with the understanding that he would repay it. As was the military judge, we are convinced that there was no "*genuine* dispute between the parties as to the facts or law relating to the debt which would affect the obligation of the appellant to pay." *MCM*, Part IV, ¶ 71c (emphasis added).

However, we have scoured the record, without success, for any evidence that a date certain was established for repayment of the debt. The evidence established that the appellant owed Ms. Barnwell $1,210, that Ms. Barnwell was trying to make arrangements to collect it, and that the appellant's attempts to avoid Ms. Barnwell and the debt were characterized by deceit and evasion. But, Ms. Barnwell never demanded payment by a certain date even though she had several opportunities to do so. When Ms. Barnwell talked with the appellant on 8 January, she wanted to meet with him so they could establish a payment schedule. The fact that she was going to meet the appellant on a payday, and that she therefore expected he would pay at least some of the debt at that time, is not sufficient to prove that the debt became due and payable on that date. Instead, the prosecution must prove that the accused was on notice that the debt was due and payable on that date. This the prosecution failed to do. Furthermore, in February, after talking with his first sergeant, the appellant contacted Ms. Barnwell. Ms. Barnwell could have demanded payment of the money immediately or by some date, but she did not. Instead, she telephoned him and told him that she could not meet or talk to him. Because the prosecution failed to prove an element of the offense, we find the appellant's conviction for dishonorably failing to pay a debt to be legally insufficient.

### II. Pretrial Punishment

At trial, the appellant asked the military judge to award him two days of confinement credit for each of the 275 days (17 February 1997 to 18 November 1997) he claimed to have been receiving illegal pretrial punish-

ment. The appellant alleged that, by taking away his SF beret and placing him in X Flight, the first sergeant imposed illegal pretrial punishment upon him. The military judge denied the motion. On appeal, the appellant limits his assertion of error to the withholding of his beret.

### A. Facts

On 17 February 1997, the appellant met with his first sergeant, alone, in the first sergeant's office. Pending the outcome of an investigation into the allegations which form the basis of the charges against the appellant, the first sergeant assigned the appellant to X Flight and told him to turn in his SF beret. The appellant relinquished his beret, which was stored on a small table in the first sergeant's office. The first sergeant claimed that he took the beret because the appellant's integrity had been called into question, and the beret signified that the conduct of SF personnel were beyond reproach.

X Flight consisted of members of the SF Squadron who, for medical reasons or because of pending investigations or administrative actions, were not authorized to bear arms or perform normal SF duties. It was designed to provide these airmen productive, non-SF work that had to be performed by someone. Members of X Flight were not permitted to wear berets while performing non-SF duties, but those who were assigned there for medical reasons were not required to turn their berets in to the first sergeant and could wear them to other squadron functions. The appellant was not asked to turn in his SF badge. By regulation, the badge can only be taken if the individual is removed from the SF career field. The first sergeant testified that it is a custom of the SF career field that one who is unable to perform SF duties should not wear the beret which is a symbol that the wearer upholds or exceeds standards.

The appellant asked the supervisor of X Flight if he could work in the barracks instead of filling sandbags. The request was denied. The appellant never complained to his first sergeant or commander about his assignment to X Flight or the loss of his beret.

### B. The Law

Article 13, UCMJ, 10 U.S.C. § 813 prohibits pretrial punishment under certain conditions.

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence, but he may be subject to minor punishment during that period for infractions of discipline.

Whether a pretrial prisoner is being unlawfully punished is of both constitutional and statutory concern. *United States v. McCarthy*, 47 M.J. 162, 164 (1997) (citing Article 13, UCMJ; *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *United States v. Palmiter*, 20 M.J. 90 (C.M.A.1985)). "It presents a 'mixed question of law and fact' qualifying for independent review." *McCarthy*, 47 M.J. at 165 (quoting *Thompson v. Keohane*, 516 U.S. 99, 113, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)).

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Wolfish*, 441 U.S. at 538–39, 99 S.Ct. 1861. *Accord Palmiter*, 20 M.J. at 95.

### C. Discussion

The prohibition on pretrial punishment contained in Article 13 applies only after the condition precedent occurs—the appellant is "held for trial." Rather than define that term, military appellate courts have glossed over it and decided the ultimate questions of

whether the accused was unlawfully punished and whether he was entitled to a remedy. In this case, we first need to determine whether the accused was "held for trial" within the meaning of Article 13.

■■■ It is the function of the legislature to make the laws and the duty of judges to interpret them. 2A Norman J. Singer, *Sutherland Statutory Construction* § 45.03 (4th ed.1984). Judges should interpret a statute so as to carry out the will of the legislature. *United States v. Dickenson*, 20 C.M.R. 154, 165 (C.M.A.1955). Otherwise, they violate the principle of the separation of powers. Singer, *supra*, § 45.05. "If the words used in the statute convey a clear and definite meaning, a court has no right to look for or to impose a different meaning." *Dickenson*, 20 C.M.R. at 165. Thus, in interpreting a statute, we employ the following process: (1) Give the operative terms of the statute their ordinary meaning; if the terms are unambiguous, the inquiry is over; (2) If the operative terms of the statute are ambiguous, then we examine the purpose of the statute as well as its legislative history; and (3) If a reasonable ambiguity still exists, then we apply the rule of lenity and resolve the ambiguity in favor of the accused. *See United States v. Ferguson*, 40 M.J. 823, 830 (N.M.C.M.R.1994).

■■■ The term "hold" has several meanings. In common parlance, it means, among other things, "to keep in custody." *The American Heritage Dictionary of the English Language* 861 (3d ed.1992). In law, the term seems to have a somewhat broader definition: "to keep in custody or under obligation." *Black's Law Dictionary* 731 (6th ed.1990). While the definitions are similar, they could result in different applications of Article 13. Under the ordinary definition, Article 13 would be limited to persons in pretrial confinement. However, our superior court has determined that "held for trial" is not synonymous with pretrial confinement— Article 13 on its face is not limited to pretrial confinees, but instead applies to servicemembers "held for trial." *United States v. Combs*, 47 M.J. 330, 333 (1997). However, the Court neglected to further explain this conclusion or tell us what "held for trial" means. Since an ambiguity exists, it is ap-

propriate that we examine the purpose of the statute as well as its legislative history.

Before 1948, no statute outlawed punishing military members prior to trial. Nevertheless, the prohibition on punishing pretrial confinees has a long history. "The imposition upon soldiers, while confined in arrest, of disciplinary punishments is, in our service, wholly illegal." William Winthrop, *Military Law and Precedents* 124 (2d ed.1920 reprint). In taking action on the sentences in such cases, reviewing authorities condemned such punishment. As one of several examples, Colonel Winthrop cites a case in which General Hancock remitted the sentence of an appellant who, while in pretrial confinement, was required to carry a heavy log for long periods of time. *Id.* (citing Do. 106, Dept. of Dakota, 1871).

In 1948, Congress provided that "nor shall any defendant *awaiting trial* be made subject to punishment or penalties other than confinement prior to sentence on charges against him." Article of War (A.W.) 16 (1948) (emphasis added), *reprinted in Manual for Courts–Martial, United States Air Forces*, App. 1 (1949). Only two years later, Congress adopted the Uniform Code of Military Justice. The prohibition on pretrial punishment was moved from A.W. 16 to Article 13, UCMJ. But, whereas A.W. 16 applied to "any defendant awaiting trial," Article 13, UCMJ, states "[n]o person, while being held for trial." The legislative history of Article 13 is sketchy, but focuses on two distinct issues: (1) Changing an interpretation of A.W. 16 which prohibited the enforcement of any punishment until final approval, even if the appellant was in confinement as a result of the court's sentence; and (2) Insuring that pretrial confinees would not be forced to break rocks with prisoners with adjudged sentences. Hearing on H.R. 2498 Before a Subcomm. of the House Armed Services Comm., 81st Cong., 1st Sess. 916–917.

The President, in interpreting Article 13, seems to have equated "held for trial" with pretrial restraint.

Pretrial restraint is not punishment and shall not be used as such. No person who is restrained pending trial may be subject-

ed to punishment or penalty for the offense which is the basis for the restraint. Prisoners being held for trial shall not be required to undergo punitive duty hours or training, perform punitive labor, or wear special uniforms prescribed only for post-trial prisoners. This rule does not prohibit minor punishment during pretrial confinement for infractions of the rules of the place of confinement. Prisoners shall be afforded facilities and treatment under regulations of the Secretary concerned.

Rule for Courts–Martial (R.C.M.) 304(f). We do not believe this Court is required to accept R.C.M. 304(f) as the law on this issue. First, the meaning of "held for trial" is substantive criminal law, and "the President's rule-making authority does not extend to matters of substantive military criminal law." *Ellis v. Jacob,* 26 M.J. 90, 92 (C.M.A.1988). Second, it appears that the President was not trying to expand the law to provide greater rights for individual servicemembers than is set forth in Article 13; he was merely interpreting Article 13 based on the facts of cases in which the issue was never fully discussed. *See Manual for Courts–Martial, United States (MCM),* A21–15 (1998 ed.). However, such a presidential determination does have persuasive influence.

 After examining the purpose of the statute, the legislative history, and the case law from our superior court, as well as considering the President's interpretation of the statute, we are convinced that for a military member to be "held for trial," he must, at a minimum, be pending trial and have his freedom of movement "substantially burdened." *Combs,* 47 M.J. at 334 (Cox, C.J., concurring). An accused may be pending trial even though charges have not been preferred. *United States v. Davis,* 30 M.J. 980, 981 (A.C.M.R.1990). This appellant failed to demonstrate, or even allege, sufficient facts to show that his freedom of movement was substantially burdened. Therefore, he was not entitled to relief under Article 13.

Judge Spisak is convinced that once charges are preferred the accused is "held for trial," and that this appellant was subjected to illegal punishment in violation of Article 13, UCMJ. She cites opinions of our superi-

or court and the Army Court of Military Review for the proposition that the public denunciation, degradation, or humiliation of an accused is sufficient to establish a violation of Article 13. *See United States v. Villamil–Perez,* 32 M.J. 341 (C.M.A.1991); *United States v. Cruz,* 25 M.J. 326 (C.M.A. 1987); *United States v. Stamper,* 39 M.J. 1097 (A.C.M.R.1994); *United States v. Latta,* 34 M.J. 596 (A.C.M.R.1992). We admit that focusing on the Court's legal judgments, without examining the facts of these cases, could lead one to conclude that public denunciation alone is sufficient to trigger Article 13. But, a close reading of the facts suggests otherwise.

In *Villamil–Perez,* the accused was apprehended on a Saturday and restricted to the barracks until about 1800 hours the next Monday. *United States v. Villamil–Perez,* 29 M.J. 524, 525–26 (A.C.M.R.1989). "Shortly after the appellant was apprehended for these offenses, his supervising officer ... directed the posting on the work area bulletin board of a Serious Incident Report" that described the alleged offenses, a record of appellant's prior misconduct, and references to the appellant's family. *Id.* at 525. In *Cruz,* the public denunciation was conducted as the individuals were being removed from a mass formation and led off to be apprehended. In both of these cases, the accused were publicly denounced, at the time of, or immediately following, the curtailment of their freedom. On the other hand, our appellant's freedom of movement was never curtailed.

Furthermore, the Court of Appeals for the Armed Forces is not a court of equity with unlimited powers. *See Clinton v. Goldsmith,* —— U.S. ——, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999). It is bound by the terms of Article 13 just as we are. While it can interpret the meaning of the statute, it cannot ignore it or decide that the words of the statute mean something they clearly do not. And, there is absolutely no support for the proposition that, for Article 13 purposes, a military member is "held for trial" once charges are preferred against him. Such a finding would be contrary to the purpose and intent of Congress.

Even if Judge Spisak is correct, that public denunciation alone, without pretrial restraint,

is sufficient to trigger Article 13, the appellant still would not be protected because he was never publicly denounced. The squadron received an anonymous complaint about the first sergeant taking the berets. In a letter posted in the training room, the guardmount room, and the squadron newsletter, the first sergeant explained the practice. Neither the appellant's name nor his alleged misconduct was mentioned in the letter.

Even if we had found the appellant was "held for trial," he would still not be entitled to relief. The appellant never complained about the loss of his beret to his superiors. Although failure to complain through his chain of command does not waive the pretrial punishment issue, "it strengthens the Government's argument that it has not violated Article 13." *United States v. Huffman,* 40 M.J. 225, 227 (C.M.A.1994). It also strengthens the government's argument that, even if there were illegal pretrial punishment, no substantial prejudice inured to appellant as a result of the illegal pretrial punishment. *Villamil–Perez,* 32 M.J. at 344.

We could better understand the dissent if the appellant had no other avenue through which he could seek redress. But, such is not the case. Military personnel, whether or not being held for trial, are entitled to seek redress of their grievances through the Inspector General or pursuant to Article 138, UCMJ, 10 U.S.C. § 938. *See Walker v. United States,* 41 C.M.R. 247, 250–251 (C.M.A.1970). If the appellant felt himself wronged, he should have raised the complaint to his commander. If the commander would not remedy the situation, the appellant could have complained to any superior commissioned officer who would have to forward the complaint to the general court-martial convening authority (GCMCA). The GCMCA would have had to examine the complaint, take proper measures to address any wrong found, and send the complete file to the Secretary of the Air Force for review and disposition. *See* Air Force Instruction 51–904, *Complaints of Wrongs under Article 138, Uniform Code of Military Justice* (30 Jun 94).

### III. Conclusion

The appellant's conviction for dishonorably failing to pay a debt, under Article 134, is set aside and dismissed. Therefore, we must determine whether we can reassess the sentence or it must be returned to the convening authority for a rehearing.

 This court may reassess a sentence instead of ordering a sentence rehearing, if we are confident we can discern the effect of the error on the sentencing authority's decision. *United States v. Reed,* 33 M.J. 98, 99 (C.M.A.1991). Thus, we must first determine what sentence the court-martial would probably have adjudged if the error had not been committed at trial. *United States v. Peoples,* 29 M.J. 426, 427 (C.M.A.1990) (citation omitted). We do that by putting ourselves in the shoes of the sentencing authority who originally adjudged the sentence. To do so, we can only consider the evidence that was before the sentencing authority at trial. If we reassess the sentence, we must consider the entire record and the allied papers in performing our statutory duty to determine whether the sentence is appropriate. *Id.* at 428.

In accordance with his pleas of guilty, the appellant was convicted of housebreaking by entering a dormitory room for the purpose of committing larceny therein, and the theft of two video game players and a cartridge for use in one of those systems. He was also convicted of stealing, on a different occasion, a bicycle of a value of approximately $2,000. Under the circumstances of this case, we are confident that without the dishonorable failure to pay a debt offense, the military judge would have sentenced the appellant to a bad-conduct discharge, confinement for 105 days, and reduction to E–1. After considering the entire record and allied papers, and having given individualized consideration to the character of the appellant's service as well and the nature and seriousness of the offenses, we find the appellant's sentence, as modified, appropriate. *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982).

The modified findings and sentence are correct in law and fact, and, on the basis of the entire record, are

AFFIRMED.

Judge SCHLEGEL concurs.

SPISAK, J., concurring in part, dissenting in part:

The majority's determination that "held for trial" is synonymous with pretrial restraint fails to heed our superior court's holdings in similar cases. While acknowledging that the United States Court of Appeals for the Armed Forces (USCAAF) determined that "[a]pplication of Article 13 is not limited to pre-trial confinees, but applies to all military members 'held for trial,'" *United States v. Combs*, 47 M.J. 330, 333 (1997), the majority ignores this guidance because USCAAF failed to specifically define "held for trial." This we may not do. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Allbery*, 44 M.J. 226 (1996); *United States v. Antonelli*, 43 M.J. 183, 184 (1995); *United States v. Jones*, 23 M.J. 301, 302 (C.M.A.1987).

Even before *Combs*, the Court of Military Appeals had found Article 13 applied to arrestees who were not in confinement. *See United States v. Cruz*, 25 M.J. 326 (C.M.A. 1987). There, the court stated: "Clearly public denunciation by the commander and subsequent military degradation before the troops prior to courts-martial constitute unlawful pretrial punishment prohibited by Article 13." *Id.* at 330.

Since *Cruz*, USCAAF and our Army brethren have found pretrial punishment, even without pretrial restraint, when commanders and superiors publicly denounced, degraded, or humiliated an accused prior to trial. *See United States v. Villamil–Perez*, 32 M.J. 341 (C.M.A.1991) (officer supervisor posted serious incident report about suspected drug offense on workplace bulletin board); *United States v. Stamper*, 39 M.J. 1097 (A.C.M.R.1994) (commander made remarks at company formations, during work details, and in accused's work area identifying accused as a criminal suspect with a propensity to steal); *United States v. Latta*, 34 M.J. 596 (A.C.M.R.1992) (first sergeant called accused his "favorite AWOL case" in front of unit formation). Moreover, this court has found pre-trial punishment even when the accused was not confined. *United States v. Washington*, 42 M.J. 547 (A.F.Ct.Crim.App.1995) (reassignment as NCO of Correctional Custo-

dy and over-broad "no contact" order were punishment).

The majority's determination that "held for trial" is synonymous with arrest or apprehension also ignores the way the military functions. Unlike a civilian accused, a military member accused of a crime cannot merely pack his bags and leave the community behind. Once accused of a crime and while charges are pending he must continue to perform those duties assigned him by his superiors and must do so at the place to which he is assigned. Moreover, once charges are preferred, the member is normally placed on administrative hold. This status may prevent him from taking leave, being assigned to temporary duties away from his home station, or separating from the service. Even if the accused is not placed on formal administrative hold, his commander and first sergeant will, no doubt, impose such limitations to ensure his presence for trial. While the member may not be under any other physical restraint, there is no doubt in my mind that a military member against whom charges have been preferred is being "held for trial."

Based on the precedents cited above and on the fact that once charges were preferred this accused was, in my opinion, being "held for trial," I would test for unlawful punishment under the two-part test normally followed for such claims. *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *United States v. Palmiter*, 20 M.J. 90, 95 (C.M.A.1985); *Washington*, 42 M.J. at 562. Applying that test, I would find that taking the appellant's beret was punishment, but no material prejudice to a substantial right of the appellant occurred. Article 59(a), UCMJ.

Although the first sergeant repeatedly testified that he did not intend to punish the appellant when he took his beret, his testimony is suspect when viewed in light of other evidence and other testimony of this same witness. The first sergeant said he took the appellant's beret because the appellant lacked integrity, and because the appellant was being investigated for misconduct. When asked by the defense counsel if he

questioned the appellant's integrity and conduct, the first sergeant responded:

> Well, it was done after he was advised of his rights, okay? [A]nd he elected to speak to a lawyer. Okay? At that time, not performing [SF] duties. So, at that time, I asked him for his beret. Yes, sir.

The first sergeant also wrote a letter, which he posted on the unit bulletin board, in which he stated that he takes berets away when he questions a Security Forces (SF) member's integrity, and to correct behavior. Both in his trial testimony and in the letter the first sergeant emphasized that the berets would be returned after administrative or disciplinary action was complete.

Finally, the first sergeant repeatedly asserted that the beret was a symbol of the authority of an SF member and, because he could not perform those duties while under investigation, he should not wear the beret. However, the SF badge or shield, which designates the wearer as a policeman, was never taken from the appellant. In fact, the first sergeant stated that removing the badge was controlled by an Air Force Instruction and the decision to take that from the appellant was not his to make. This testimony casts doubt on the notion that the reason the appellant's beret was taken was simply because he was not performing police duties.

Neither the first sergeant nor his commander ever publicly identified the appellant as an offender. No one ever publicly denounced him because he was under investigation. However, posting the letter for all in the unit to see served to publicly denounce those who had been told to give their berets to the first sergeant. Such members, including the appellant, were easily recognized by the lack of a beret. Additionally, the first sergeant and others testified that the beret represented the very essence of being an SF member, that it took hard work to earn, and that losing it was embarrassing and humiliating.

The first sergeant's testimony that taking the beret was designed to get a member's attention and to correct behavior also convinces me that this was not an innocuous action. Rather, I am convinced that the taking of the appellant's beret and keeping it

from him for 9 months served only one purpose—pre-trial punishment. Even if I could get past the intent prong of the *Palmiter* test, I do not see the taking of the appellant's beret as reasonably serving a legitimate non-punitive purpose.

Nevertheless, I would find the harm caused by this action to be *de minimis* and grant, at most, one-day credit per month of punishment. Because we have no evidence that the appellant was ever placed on administrative hold, I would determine that punishment began when charges were preferred. The appellant was then clearly being "held for trial."