UNITED STATES, Appellee,

v.

Sergeant Major Edward J. GLEASON,
439–60–0554, United States Army,
Appellant.

ACMR 8803009.

U.S. Army Court of Military Review.

28 Feb. 1994.

For Appellant: Charles W. Gittins (argued); Captain Robert L. Carey, JAGC, Captain Christopher W. Royer, JAGC (on brief); Captain Michael A. Egan, JAGC.

For Appellee: Captain John G. Giovannelli, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Richard A. Cefola, JAGC, Major Joseph C. Swetnam, JAGC, Major James L. Pohl, JAGC, Captain Robert J. Walters, JAGC (on brief).

Before CREAN, Senior Judge, and MORGAN and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT

CREAN, Senior Judge:

This case has taken a long and arduous journey through the military justice system. It is a tale more appropriate for soldiers of fortune than soldiers of the United States Army. Emotions in the appellant's unit ran so high, both for and against him, that there were significant unlawful command influence issues that required extensive judicial hearings, thousands of pages in the record of trial, and two separate command investigations.

The appellant was tried by a general court-martial[1], composed of officer members, for soliciting another to commit murder, violating Army Regulation 600–50 by having a financial conflict of interest, and communicating a threat, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892 and 934 (1988). He pleaded not guilty to a charge of soliciting another to commit murder but guilty to a charge of the lesser-included offense of requesting another to plant contraband on the victim to set him up for being charged with false offenses in order to ruin his career. He also pled not guilty to the other two offenses. The court found the appellant guilty of soliciting another to commit murder and violating the regulation, but not guilty of communicating a threat. The court, on 21 October 1988, sentenced him to confinement for seven years, reduction to Private E1, and forfeiture of all pay and allowances.

The military judge erred[2] in his sentencing instructions to the members. A rehear-

---

1. The Army command and the staff judge advocate's office on Okinawa were very small. There was an inter-service arrangement for the use of United States Marine Corps legal personnel in Army courts-martial. In this case, in addition to civilian counsel and Army military counsel, the appellant was represented by a Marine judge advocate. The military judge was also a Marine judge advocate and the court reporter personnel were Marines. We commend the Marine personnel for their professionalism in this case.

2. The military judge instructed that as long as the appellant was not sentenced to a punitive discharge, he would be entitled to receive retired pay as a Sergeant Major, E–9. Unfortunately, two weeks before the appellant's court-martial, Congress had changed the law so that a soldier reduced in grade by a court-martial would receive retired pay at the reduced grade. This change had not been communicated to the field at the time of trial and the military judge became aware of the new law only later.

ing on the sentence was held on 1 December 1988, and the court members sentenced the appellant to the same punishment. The convening authority on 29 January 1989 approved the sentence as adjudged.

Original briefs were filed with this court on 12 June 1990. On 22 March 1991, this court ordered a *DuBay*[3] hearing on the issue of unlawful command influence. We ordered the military judge to make specific findings on a number of issues. Hearings were held in July and October 1991 and January 1992 before military judge Colonel Raymond Cole, at Fort Leavenworth, Kansas. Judge Cole issued his findings of fact and conclusions of law on 22 July 1992. The appellant's supplemental brief was filed on 22 February 1993 and the government's reply brief was filed on 15 June 1993. Argument was heard by this court on 14 December 1993.

The appellant contends, inter alia, that the evidence is legally and factually insufficient to support the findings of guilty, that a recording of a conversation between the appellant and a government informant should not have been admitted as evidence since it was obtained in violation of the approval order of the Army General Counsel, and that there was unlawful command influence that requires dismissal of the charges. We agree that the evidence is legally and factually insufficient to support the findings of guilty as to the offense violating Army Regulation 600–50, but hold that the evidence is sufficient to support the finding of guilty of solicitation to commit murder. We disagree that the recording should not have been admitted. We find unlawful command influence, but only that it affected the sentence. We affirm the finding of guilty as to the solicitation of murder and reassess the sentence.

## I. Facts of the Case

The appellant was the former company sergeant major of Company B, 1st Battalion, 1st Special Forces Group [hereinafter 1/1 SF] stationed on Okinawa. The mission of 1/1 SF required numerous deployments to Thailand to conduct training exercises. Since the parent unit of 1/1 SF was stationed over 7,000 miles away at Fort Lewis, Washington, the battalion enjoyed a great deal of autonomy. The battalion was a small but close knit organization, with all members, both officer and enlisted, working and socializing together. As soon as something happened, it was common knowledge in the battalion. The appellant was one of the original soldiers assigned to the 1/1 SF upon its formation in 1984. He was highly regarded by the soldiers in the unit.

Lieutenant Colonel (LTC) Suchke became commander of the 1/1 SF in December 1987. Judge Cole in his findings at the *DuBay* hearing found that LTC Suchke's perception of his unit upon taking command set the stage for his later actions. Lieutenant Colonel Suchke felt that "the battalion was too loose, too laid back, I charged myself to bringing the 1st Battalion in line or back in the Army again." Among his concerns was information from a unit noncommissioned officer concerning gun and drug smuggling by members of Company B, to include the appellant. One general officer told LTC Suchke to turn the unit around, while another general officer complained about the appellant by name.

After participating in a number of deployments to Thailand, Captain (CPT) Dumpson, a detachment commander in the appellant's company, told his superiors that some members of the unit, including the appellant, were involved in filing false travel vouchers. Based on this information, LTC Suchke ordered an investigation into travel fraud in Company B, pursuant to Army Regulation 15–6. Army Regulation 15–6: Procedure for Investigating Officers and Boards of Officers (11 May 1988) [hereinafter AR 15–6].

Lieutenant Colonel Suchke also determined that the appellant was a disruptive influence in the unit. He felt that "there were certain things going on in the unit that just couldn't be condoned. I have a responsibility as an officer and as the commanding officer of the unit and I took responsibilities very seriously." Accordingly, in April 1988, LTC Suchke relieved both the B Company Commander, Major (MAJ) Gauthier, and the appellant and assigned them to low level staff positions within the battalion.

3. *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (C.M.A.1967).

The appellant believed that by reporting the travel fraud, CPT Dumpson was attempting to ruin the careers of several members of the company. The appellant wanted to get rid of CPT Dumpson. He admitted that he contacted a Mr. James Fowler, a former U.S. soldier retired on disability and now living in Thailand, about taking some action against CPT Dumpson. The appellant admitted that he solicited Mr. Fowler to "frame" CPT Dumpson and ruin his career with false drug deals and fraud schemes. Mr. Fowler testified that the appellant solicited him to hire some Thai thugs to murder CPT Dumpson. The appellant wrote notes to Mr. Fowler, delivered by the appellant's Thai girlfriend, confirming an arrangement between Mr. Fowler and the appellant. The notes do not outline the exact nature of the arrangement.

The appellant and Mr. Fowler were to meet in Thailand in late July 1988 to finalize their arrangements. But Mr. Fowler got cold feet. He informed another member of 1/1 SF, Sergeant First Class (SFC) Mathias, of the arrangement with the appellant to kill CPT Dumpson. Sergeant First Class Mathias notified the battalion command, and they in turn notified the Army Criminal Investigation Command (CID).[4] The CID received authorization from the United States Army General Counsel to conduct a recording of a meeting between Mr. Fowler and the appellant. *See* Military Rule of Evidence 317 [hereinafter Mil.R.Evid.]; Army Reg. 190–53, Military Police: Interception of Wire and Oral Communications for Law Enforcement Purposes (3 November 1986). The authorization was granted on 20 July 1988 "subject to coordination with host nation law enforcement officials".

The appellant called Mr. Fowler to notify him that he was coming to Thailand and arranged for a meeting on 21 July 1988. This meeting was to be held before CID could get the proper recording equipment and before coordination could be made with local officials[5]. Nevertheless, Mr. Fowler was provided with a small tape recorder to use in recording the meeting. Mr. Fowler placed the tape recorder in the drawer of a small desk in the hotel room.

In the approximately twenty-three-minute taped conversation, Mr. Fowler mentioned a number of times that he had hired the Thais to kill CPT Dumpson. The appellant acknowledged the plan but wanted it called off because he had been alerted by another Special Forces soldier that the CID may be aware of the plot. The soldier told the appellant that the CID was in Bangkok because an informer had told them that the appellant was attempting to arrange for CPT Dumpson to be killed. The appellant knew that if CPT Dumpson was killed he would be a prime suspect.

A large portion of the conversation dealt with the loss of $50,000.00 of the appellant's money. The appellant gave the money to Staff Sergeant (SSG) Fowler, Mr. Fowler's son, who was also a member of the appellant's unit, to take to Thailand with him. The money was wrapped in a black plastic bag and placed in the false bottom of a footlocker. Allegedly, the money was to go to a Mr. Doug Harrison to renovate a club in Bangkok called the Texxan Club. Staff Sergeant Fowler was to give the money to his father who in turn was to give it to Mr. Harrison. The money was turned over to the senior Fowler by his son in the coastal town of Pataya. The senior Fowler allegedly did not know what was in the black plastic bag. On his way to Bangkok, he allegedly ran into a Thai police roadblock and tossed the bag containing the money out the window onto the side of the road. In other words, the appellant's $50,000.00 was "lost." The appellant alleged that Mr. Fowler made up the story on the roadblock and stole the

---

4. It should be noted that LTC Suchke was so unsure of the actions in the battalion and who he could trust that he first brought the allegation against the appellant of soliciting another to commit murder to the attention of the Air Force Office of Special Investigations (OSI) rather than the Army CID. The record is unclear how the case eventually got into the right channels of the Army CID.

5. The CID had coordinated with the Regional Security Officer for the United States Embassy to coordinate with Thai officials. The embassy officials did not have time to make the coordination with the host country law enforcement officials.

appellant's money. The appellant alleged further that Mr. Fowler made up the story of solicitation to murder to keep the appellant in jail and therefore not after him for the money. Mr. Fowler claims that the money was probably to pay for the "hit" on CPT Dumpson.

In February 1988, a Master Sergeant (MSG) McCan, another member of the 1/1 SF, was approached by a Doug Harrison, a part owner of the Texxan bar, about investing in the bar. Master Sergeant McCan was to buy a 25 percent interest for $15,000.00. Master Sergeant McCan talked to the appellant and they each agreed to put up $7,500.00 to buy a 12½ percent interest for each. In February 1988, the money was given to Harrison to see if a deal could be arranged with "George", a part owner of the bar. Harrison started to negotiate with "George", for the sale of the 25 percent interest but the deal was not completed until May 1988.

In late March 1988, while the appellant was still the company sergeant major, B Company was on an exercise in Thailand and was to redeploy to Okinawa from a Thai airbase near Bangkok. It is normal practice on such redeployments for the company to collect money from soldiers to buy box lunches for the plane trip. Purchase of box lunches is voluntary for the soldiers. Just prior to the redeployment, the company communication sergeant, SFC McIntire, called all of the detachments to determine the number of box lunches to be purchased.

The normal practice was to buy the lunches from the Texxan Bar. Sergeant First Class McIntire asked the appellant where to buy the box lunches. The appellant told him that the only good place was the Texxan Bar. Sergeant First Class McIntire agreed but asked the appellant if he had a conflict of interest since he knew the appellant was negotiating an interest in the bar. The appellant told him that he did not believe he had a conflict since he did not yet have an interest in the bar. In any event,

there is some evidence that the company commander, MAJ Gauthier, had previously approved the purchase of the box lunches from the Texxan bar.

The appellant was apprehended in Bangkok on 21 July 1988 after his meeting with Mr. Fowler. At the direction of LTC Suchke, he was returned to Okinawa on 28 July 1988 in leg irons and chains, under a Marine guard, and confined in the Marine Brig on Okinawa. The appellant could have no visitors, except immediate family members and his lawyers, unless approved by LTC Suchke. Judge Cole found that this did not affect the appellant's ability to participate in the preparation of his defense. No explanation was provided to the members of B Company on why this action was required. The members of B Company, on Okinawa at the time, were called in, their areas searched, and interrogated by the CID about gun and drug smuggling. The remainder of the unit, upon returning from Thailand on 28 July 1988, underwent a lengthy and thorough customs inspection at the airport and were then locked down in their unit area. Major Gauthier was relieved of his position on or about 28 July 1988, his security clearance was suspended, and he was locked out of the battalion area.[6]

Sometime between 29 July and 1 August 1988, LTC Suchke held a meeting of the battalion officers. He told them that the appellant's military defense counsel, CPT Rush, was the "enemy" and the trial counsel, CPT Totin, was their "friend." It was ironic that CPT Totin was present at this meeting and that before this event, CPT Rush had enjoyed an excellent reputation with LTC Suchke and the battalion. Lieutenant Colonel Suchke had even tried to get CPT Rush assigned as the battalion legal officer. This unit was such a close-knit organization that all members of the battalion were almost immediately aware of LTC Suchke's "enemy" characterization of the defense counsel.

---

6. The defense alleged that MAJ Gauthier was relieved from this position because he had testified favorably for the appellant at a pretrial confinement hearing. However, Judge Cole found while there was a general feeling in the battalion that MAJ Gauthier was dealt with unfairly it was not the result of his favorable testimony for the appellant. The relief of MAJ Gauthier and the subsequent adverse Officer Efficiency Report were well-known in the battalion. The reasons for these actions were just never explained to the unit members.

When the staff judge advocate, MAJ Reid, learned of the speech the next day, he required LTC Suchke to issue a retraction. Lieutenant Colonel Suchke did speak to his officers on 3 August 1988 to clarify his earlier statement, but that retraction has been characterized in the various investigations as ineffective. The retraction was repeated at a full battalion physical training formation sometime between 4 and 7 August 1988. Judge Cole found that by this time the members of B company felt that they were targeted and under attack by LTC Suchke.

On 8 August 1988, Sergeant (SGT) Potsanant, a member of B Company, died when a land mine he illegally had in his possession exploded in his hands. The unit had conducted an inspection of its area a few days earlier to ensure that no unauthorized explosive devices were in the unit area. Sergeant Potsanant had hidden his mine from his unit chain of command.

A few days after SGT Potsanant's death, Command Sergeant Major (CSM) McGuire, the 1st Special Forces Brigade Command Sergeant Major from Fort Lewis, Washington, arrived in Okinawa and spoke to the battalion noncommissioned officers (NCO). He felt that law, order and discipline were lax in the unit and that the NCOs were not doing their job as indicated by the arrest of the appellant and the death of SGT Potsanant. Command Sergeant Major McGuire's comments were heated and threatening. He stated that "It is hell seeing your friend (the appellant) behind bars because he was greedy. Greed put him where he is now." He further stated that there was a cancer in the unit and he was going to get rid of the cancer. He threatened that any NCO who would not or could not do his job would be removed. Judge Cole found that there was no credible evidence to show that any potential witness was affected or dissuaded from testifying for the appellant because of CSM McGuire's tirade.

Master Sergeant McCan, the same NCO who was to be a business partner of the appellant, was selected by LTC Suchke to be the first sergeant of Headquarters Company. He was enrolled in and scheduled to attend the first sergeant's course, and was "shadowing" the present first sergeant to learn the job. He testified for the appellant at his trial just prior to findings. The prosecutor wrongly felt that the testimony should have been disclosed to him before trial by MSG McCan. Judge Cole found that MSG McCan had revealed his testimony earlier to the CID, and it was in the CID file, and the prosecutor had "just plainly overlooked the statement." Unfortunately, the prosecutor told the company commander that MSG McCan had withheld this testimony from him. The company commander told LTC Suchke, who immediately stopped the assignment of MSG McCan as first sergeant. The reasons given by LTC Suchke to the unit for the change of MSG McCan's assignment were inaccurate and disingenuous. The change of assignment fed the battalion rumor mill that MSG McCan was relieved because he testified for the appellant.

## II. Violation of the Regulation

Before turning to the issue of unlawful command influence, we will discuss the alleged violation of Article 92. The appellant is charged with violating paragraph 2–1(b), Army Regulation 600–50 which reads in part:

> In performing their duties and responsibilities, DA personnel will not engage in any personal business or professional activities, or have or retain any direct or indirect financial interest, that places them in a position in which there is a conflict of interest or the appearance of a conflict between their private interests or affiliations and the public interest of the United States as it relates to their duties and responsibilities as DA personnel.

A punitive regulation, like a penal statute, is to be strictly construed. *United States v. Sweitzer*, 14 U.S.C.M.A. 39, 33 C.M.R. 251 (1963); *United States v. Rowe*, 13 U.S.C.M.A. 302, 32 C.M.R. 302 (1962); *United States v. Smith*, 16 M.J. 694, 702 (A.F.C.M.R.1983); *United States v. Louder*, 7 M.J. 548, 550 (A.F.C.M.R.1979); *United States v. Perkins*, 50 C.M.R. 377 (A.F.C.M.R. 1975). Our reading of the provisions of this regulation is that a servicemember cannot have a present as opposed to a possible future financial interest that conflicts with his duties and responsibilities and the public

interest of the United States. The facts are undisputed. In March 1988, at the time of the purchase of the box lunches, the appellant did not have a financial interest in the Texxan Bar. He had provided money to an intermediary to arrange for his interest. The interest was only prospective and tenuous at best. We find that the regulation prohibits dealing with a present but not a future financial interest. Therefore, this finding of guilty of violation of the regulation cannot stand and the finding of guilty of that offense is set aside and the charge is dismissed.

III. Admission of the Taped Conversation

■ The appellant asserts that the tape recording of the conversation between him and Mr. Fowler should not have been admitted into evidence. He specifically asserts that the recording was done without coordination with Thai police authorities, in violation of the specific requirement of the Army General Counsel. The appellant did not object at trial to the admissibility of this evidence.

The rationale for coordination with local police authorities is contained in the CID guidance on requesting authorization to conduct an intercept. That guidance states that the Army General Counsel, as the approval authority, requires an affirmative statement of coordination with local law enforcement personnel so that there will be local police available in case there is a problem with the intercept, and so that the intercept will not conflict with other law enforcement efforts. *See* USACIDC Supplement 1 to Army Reg. 190–53, 1 December 1985, Appendix C, paragraph B(3). There may also be a sovereignty concern that the United States is conducting a law enforcement activity in the territory of another country. We find that this requirement to coordinate was for the benefit of the police and not the appellant. Accordingly, we hold that the appellant had no standing to object to the admissibility of the evidence based on a lack of coordination with the local Thai police.

IV. Command Influence

There is no need for this court to outline the evil effects of unlawful command influence in the military justice system. The United States Court of Military Appeals has carefully set forth the reasons that unlawful command influence cannot be tolerated. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A.1986). It is a malignancy that eats away at the fairness of our military justice system.

■ In most cases, the evil of unlawful command influence is manifested by overt actions. In this case, there was no single act on which to hang the label of unlawful command influence. Rather, it was a command climate or atmosphere created by the actions of LTC Suchke. His actions of relieving the command structure of Company B without explanation; the characterization of the defense counsel as the enemy; returning the appellant to Okinawa in chains and under guard and placing him in the brig and requiring unit members to receive command permission to visit him; the inspections and unit lock downs without explanation; adverse officer efficiency reports and reliefs of individual without explanation shortly after testifying favorably for the appellant created, as Judge Cole found, a pervasive atmosphere in the battalion that bordered on paranoia. We find that the command climate, atmosphere, attitude, and actions had such a chilling effect on members of the command that there was a feeling that if you testified for the appellant your career was in jeopardy. We do not make these findings lightly. The two investigations ordered by the command, the Inspector General investigation and the AR 15–6 investigation, each found the same improper command atmosphere and also that it may have been or was unlawful command influence. The investigators left us to determine if there was unlawful command influence and, if so, whether it prejudiced the appellant's court-martial.

This unlawful command influence could not possibly have been resolved by lawyers alone. The military judge did everything he could to keep the trial free of unlawful command influence. He prohibited LTC Suchke from testifying for the government on aggravation and restricted him from the court room and court area. The convening authority, Colonel Harley, who had no command authority over LTC Suchke, confronted him about the relief of witnesses. The convening authority also did not select as court mem-

bers for the appellant's case officers from LTC Suchke's battalion, even though this was the largest group of potential court members. The staff judge advocate did all in his power to neutralize actions by LTC Suchke. This was a command issue that had to be resolved by the command. The only action to save the situation was the creation of a different command climate and atmosphere. Unfortunately, the next senior command was far removed from the scene of the action.[7]

In a case where unlawful command influence is found, a reviewing court may not properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the unlawful command influence. *Thomas,* 22 M.J. at 394. We are absolutely convinced that the unlawful command influence did not affect the findings of guilty. The appellant can only point to two potential witnesses that could have testified on the merits of the offense. The testimony of both witnesses concerned an insignificant peripheral issue and would not have overcome the overwhelming evidence of guilt. In addition, Judge Cole specifically found that one of the witnesses would not have been intimidated from testifying by anyone, and, in any event, his credibility was suspect.

We are not convinced beyond a reasonable doubt, however, that the sentence was not affected by the unlawful command influence. There is no doubt that the appellant had served brilliantly for almost twenty-six years. He was highly regarded in the Special Forces community and was considered almost God-like by the soldiers in his company. Yet, no soldier from the appellant's unit testified for him on extenuation and mitigation. The only testimony was from a Marine guard in the brig, a company sergeant major from C Company, another from the brigade support battalion, a warrant officer from C Company who had served with the appellant in B Company, and a former commander no longer in the battalion. Under normal circumstances, we believe that more soldiers, especially from B Company, would have been standing in line

to testify for the appellant. They would be unlikely to testify if they were concerned that their testimony for the appellant would place their careers in jeopardy. For this reason, we are convinced that the appellant's sentence was tainted by unlawful command influence.

In cases where this court cannot reliably determine the sentence that would have been imposed at the trial level if error had not occurred, the case is returned for a rehearing on the sentence. *United States v. Sales,* 22 M.J. 305, 307 (C.M.A.1986). However, this case is almost six years in the making. It has already consumed enormous resources and effort of the military justice system. In the interest of judicial economy, we will reassess the sentence to that which we reliably know a court would assess if there had not been unlawful command influence. We know that a court would have imposed confinement, but we do not reliably know the period. We know a court would have imposed some type of forfeiture but do not reliably know the amount or duration of the forfeitures a court would adjudge. We are absolutely certain, however, that no court would have permitted the appellant to serve in any grade other than the lowest enlisted grade.

We have carefully considered the other errors asserted by the appellant either personally, pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), or through counsel and find them without merit.

The findings of guilty of Additional Charge I and its Specification are set aside and Additional Charge I and its Specification are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record, the court affirms only so much of the sentence as provides for a reduction to Private E1.

Judge MORGAN and Judge GONZALES concur.

---

7. It is this court's understanding that LTC Suchke was eventually relieved from command

and removed from the promotion list to colonel. We are not aware of any other corrective actions.