UNITED STATES, Appellee

v.

Edward J. GLEASON, Jr., Sergeant Major, U.S. Army, Appellant.

No. 94–1040.
CMR No. 8803009.

U.S. Court of Appeals for the Armed Forces.

Argued Nov. 1, 1994.*

Decided Sept. 27, 1995.

---

* This case was argued at Wake Forest University. *See United States v. Raymond,* 38 MJ 136, 137 n. 1 (1993).

For Appellant: *Charles W. Gittins* (argued); *Captain Christopher W. Royer* (on brief).

For Appellee: *Captain John G. Giovannelli* (argued); *Colonel John M. Smith* and *Captain Michael E. Mulligan* (on brief).

*Amicus Curiae urging reversal:*

*Jennifer Perry* (Law Student) (argued); *Carol B. Anderson* and *Ronald F. Wright* (on brief)—For Clinical Appellate Program, Wake Forest University School of Law.

*Opinion of the Court*

EVERETT, Senior Judge:

1. The "long and arduous journey [of this case] through the military justice system"[1] began with Sergeant Major Gleason's trial by a general court-martial with officer members sitting in Okinawa. The charges were violation of Army Regulation 600–50 by having a

---

1. *United States v. Gleason,* 39 MJ 776, 777 (ACMR 1994). In addition to the appellate review of this case, there also have been official investigations of some of the related events; and on September 29, 1990, the Gleason case received coverage on the television program, "60 Minutes."

financial conflict of interest, solicitation to commit murder, and communication of a threat, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 USC §§ 892 and 934, respectively. To the charge that he had solicited another to murder Captain Dumpson, Gleason pleaded not guilty but guilty of a lesser-included offense (requesting another to plant contraband on Dumpson in order to incriminate him falsely and ruin his military career).[2] Appellant pleaded not guilty to the other charges.

2. The general court-martial convicted Gleason of the solicitation to murder and the violation of regulations, but acquitted him of communicating a threat. On October 21, 1988, appellant was sentenced to confinement for 7 years, total forfeitures, and reduction to Private E–1. However, because of an error in his sentencing instructions,[3] the military judge held a rehearing[4] on the sentence on December 1, 1988; and the court members reimposed the same sentence as before. In turn, on January 20, 1989, the convening authority approved the sentence.

## I

3. After briefs had been filed in the Court of Military Review,[5] that court ordered a *DuBay*[6] hearing on the issue of unlawful command influence. Hearings were held in July and October 1991 and January 1992 before a military judge, Colonel Raymond Cole, who then issued his findings of fact and conclusions of law on July 22, 1992. After the parties had filed further briefs, the Court of Military Review heard argument on December 14, 1993, and rendered its decision 2 months later.

4. The court below ruled that the evidence was insufficient to sustain a conviction of violating AR 600–50, because it failed to establish that Gleason had a present financial interest in conflict with his military duties. Although the Court of Military Review did

2. The language of the guilty plea was "request of James B. Fowler to plant contraband in the possession of Captain Paul G. Dumpson, United States Army, for the purpose of having Captain Dumpson wrongfully arrested, prosecuted and convicted of the possession of such contraband which language, suggested to the said James B. Fowler to commit an obstruction of justice, an offense under the Code." The defense and government counsel agreed that the maximum punishment for this lesser offense was 4 months' confinement, forfeiture of two-thirds' base pay per month for 4 months, and reduction to E–1.

3. After trial, the military judge became aware of a very recent change by Congress in the statutory provisions for retired pay of members reduced in grade by courts-martial. 39 MJ at 777 n. 2. On September 29, 1988, § 1401a(f) of Title 10 had been amended by adding: "However, in the case of a member who, after initially becoming eligible for retired pay, is reduced in grade pursuant to a sentence of a court-martial, such compensation may not be based on a grade higher than the grade in which the member is retired." Pub. L.No. 100–456, Div. A, Title VI, Part C, § 622(a), 102 Stat. 1983. Section 622(b) provides that this provision "shall take effect on the first day of the first month that begins after the date of the enactment of this act [Oct. 1, 1988] and shall apply to the compensation of the retired or retainer pay of members who initially become entitled to such pay on or after such effective date." 102 Stat. 1983. The military judge concluded that Gleason was not "entitled" to retirement pay at the time of the first trial.

4. The sentence rehearing apparently was conducted before the same ten members who participated in the original trial. (R. 954, 961, 977.) The members who were present were not listed in the record as they should have been at the beginning of the session following the Article 39(a) session on December 1, 1988. While there was a statement that "the convening authority ... requested the rehearing" (R. 953), there is no indication he formally ordered the rehearing. The record also reflects that neither side objected to the rehearing. We note that Article 63, UCMJ, 10 USC § 863 (1983), prohibits the members who sat in the original proceeding from sitting on a rehearing. On the other hand, if this proceeding is treated as a proceeding in revision, there is no problem in having the same members. However, the purpose of the proceeding in December was to correct an error in the sentencing instructions, which is not a proper purpose for a proceeding in revision. *See United States v. Roman*, 22 USCMA 78, 81, 46 CMR 78, 81 (1972). In view of our disposition of this case we need not determine the validity of the rehearing on sentence. If it was invalid, the original proceeding would be reinstated, so a sentence existed which gave the Court of Military Review jurisdiction. *See* Art. 66(b)(1), UCMJ, 10 USC § 866(b)(1).

5. *See* 41 MJ 213, 229 n. * (1994).

6. *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).

find "unlawful command influence," it was "absolutely convinced that [this influence] did not affect the findings of guilty"; so appellant's conviction of soliciting murder was affirmed. Because the court below was "not convinced beyond a reasonable doubt, however, that the sentence was not affected by the unlawful command influence," the sentence was reassessed; and only so much of the sentence was affirmed as provided for reduction to Private E-1. 39 MJ 776, 783 (1994). Appellant then petitioned this Court for review.

## II

5. At one time Gleason was the company sergeant major of Company B, 1st Battalion, 1st Special Forces Group, which was stationed on Okinawa but frequently was deployed to Thailand on training exercises. Because its parent organization was located over 7000 miles away at Fort Lewis, Washington, the battalion enjoyed considerable autonomy, and its members, both officer and enlisted, worked and socialized closely together.

6. In December 1987, Lieutenant Colonel (LTC) Suchke became battalion commander; soon thereafter he received reports of gun and drug smuggling by Gleason and others in Company B. Moreover, Captain Dumpson, a detachment commander in that company, had told his superiors that appellant and some other members of the unit had filed false travel vouchers concerning deployments to Thailand.

7. Believing that Captain Dumpson was attempting to harm several members of Company B, Gleason contacted Mr. James Fowler, a retired soldier living in Okinawa. According to appellant, he solicited Fowler to "frame" Captain Dumpson for committing various crimes. Fowler's version was that Gleason solicited him to hire some Thais to murder Dumpson.

8. Gleason and Fowler were to meet in Thailand in late July 1988 to work out details; but, for whatever reason, Fowler had a

change of heart. He informed Sergeant First Class Matias, another member of the 1st Special Forces Group, that he had agreed with Gleason to kill Captain Dumpson, and ultimately the Army Criminal Investigation Command (CID) was notified.[7]

9. The CID obtained authorization from the Army General Counsel to record surreptitiously an intended meeting between Fowler and appellant; and on July 21, 1988, this meeting was recorded by Fowler on a small tape recorder. As described by the court below:

In the approximately twenty-three-minute taped conversation, Mr. Fowler mentioned a number of times that he had hired the Thais to kill Captain Dumpson. The appellant acknowledged the plan but wanted it called off because he had been alerted by another Special Forces soldier that the CID may be aware of the plot. The soldier told the appellant that the CID was in Bangkok because an informer had told them that the appellant was attempting to arrange for CPT Dumpson to be killed.

39 MJ at 779.

10. After his tape-recorded meeting with Mr. Fowler, Gleason was apprehended in Bangkok; and, at the direction of LTC Suchke, the Battalion Commander, he was soon returned to Okinawa in leg irons and chains. Subsequently Suchke made clear to the members of his battalion that he believed Gleason to be guilty, that Gleason's defense counsel was the "enemy," and that testimony should not be offered on behalf of the accused.

11. The Court of Military Review found that

there was no single act on which to hang the label of unlawful command influence. Rather, it was a command climate or atmosphere created by the action of LTC Suchke. His actions of relieving the command structure of Company B without explanation; the characterization of the defense counsel as the enemy; returning the appel-

7. Initially Matias informed LTC Suchke, the battalion commander. Apparently because of concern that someone in the CID might leak information to Gleason, Suchke initially contacted the Air Force Office of Special Investigations (OSI), rather than the CID. 39 MJ at 779 n. 4.

lant to Okinawa in chains and under guard and placing him in the brig and requiring unit members to receive command permission to visit him; the inspections and unit lock downs without explanation; adverse officer efficiency reports and reliefs of individual [sic] without explanation shortly after testifying for the appellant created, as Judge Cole found [at the *DuBay* hearing], a pervasive atmosphere in the battalion that bordered on paranoia. We find that the command climate, atmosphere, attitude, and actions had such a chilling effect on members of the command that there was a feeling that if you testified for the appellant your career was in jeopardy.[8]

39 MJ at 782.

### III

12. In this case the actions of the battalion commander fall squarely within the prohibitions of Article 37(a), UCMJ, 10 USC § 837(a), that "[n]o person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial...." *Cf. United States v. Stombaugh*, 40 MJ 208 (CMA 1994). Moreover, acts of this type infringe upon important constitutional and statutory rights of servicemembers.

■■■■ 13. In *Stombaugh*, this Court reiterated that the "protection of the United States Constitution and Federal laws apply [sic] to members of the armed forces 'except those [protections] which are expressly or by necessary implication inapplicable,' *United States v. Jacoby*, 11 USCMA 428, 430–431, 29 CMR 244, 246–47 (1960)." 40 MJ at 211–12. A commander's interference with access to witnesses by a military accused or his or her defense counsel threatens "the fundamental right to a fair trial and the Sixth Amendment right to compulsory process, and the right to

confront and to cross-examine witnesses." *Id.* at 212 (citation omitted). Such interference also infringes on the right to counsel granted by the Sixth Amendment and by the Uniform Code,[9] for a defense counsel cannot properly render assistance to the client when precluded from interviewing witnesses or obtaining their truthful testimony. Finally, the battalion commander's conduct clearly transgressed Article 46 of the Uniform Code, 10 USC § 846, which mandates that the "trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence."[10]

■■■ 14. Not every constitutional violation, however, requires corrective action; and the findings and sentence of a court-martial can be affirmed if the reviewing court concludes beyond a reasonable doubt that the trial result was not affected by that violation. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Remai*, 19 MJ 229 (CMA 1985); *cf. United States v. Thomas*, 22 MJ 388, 394 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Likewise, even though "[c]ommand influence is the mortal enemy of military justice" and "involves 'a corruption of the truth-seeking function of the trial process,'" 22 MJ at 393, this Court has affirmed a trial result when it was convinced beyond a reasonable doubt that the result had not been affected by that influence. *Id.* at 394, 396–97.

15. The Court of Military Review correctly perceived that, having found unlawful command influence, it could affirm the findings of guilty and the sentence only if it were convinced beyond a reasonable doubt that they were unaffected by the battalion commander's unlawful command influence. Applying this standard, the court below concluded:

> the Assistance of Counsel for his defence." Article 27(a)(1), UCMJ, 10 USC § 827(a)(1), requires that a "defense counsel ... be detailed for each general and special court-martial."

8. The court below added: "We do not make these findings lightly. The two investigations ordered by the command, the Inspector General investigation and the AR 15–6 investigation, each found the same improper command atmosphere and also that it may have been or was unlawful command influence." 39 MJ at 782.

9. The Sixth Amendment gives the accused the right "[i]n all criminal prosecutions, ... to have

10. Contrary to this norm, the battalion commander advised his subordinates that, unlike trial counsel, defense counsel was their "enemy." 39 MJ at 780.

We are absolutely convinced that the un-lawful command influence did not affect the findings of guilty [of solicitation to commit murder]. The appellant can only point to two potential witnesses that could have testified on the merits of the offense. The testimony of both witnesses concerned an insignificant peripheral issue and would not have overcome the overwhelming evidence of guilt. In addition, Judge Cole specifically found that one of the witnesses would not have been intimidated by anyone, and, in any event, his credibility was suspect.

39 MJ at 783.

16. As to the sentence, the conclusion was quite different. According to Senior Judge Crean:

We are not convinced beyond a reasonable doubt, however, that the sentence was not affected by the unlawful command influence. There is no doubt that the appellant had served brilliantly for almost twenty-six years. He was highly regarded in the Special Forces community and was considered almost God-like by the soldiers in his company. Yet no soldier from the appellant's unit testified for him on extenuation and mitigation. The only testimony was from a Marine guard in the brig, a company sergeant major from C Company, another from the brigade support battalion, a warrant officer from C Company who had served with the appellant in B Company, and a former commander no longer in the battalion. Under normal circumstances, we believe that more soldiers, especially from B Company, would have been standing in line to testify for the appellant. They would be unlikely to testify if they were concerned that their testimony for the appellant would place their careers in jeopardy. For this reason, we are convinced that the appellant's sentence was tainted by unlawful command influence.

39 MJ at 783.

17. Appellant contends that the Court of Military Review has unduly minimized the benefit that the defense would have received from the testimony of the "two potential witnesses that could have testified on the merits of the offense." The correctness of this contention need not be decided because clearly the battalion commander's interference with Gleason's access to witnesses injured him in another way.

18. In this connection *Thomas* has these relevant observations:

[I]f an accused properly raises the issue that his ability to secure favorable evidence has been impaired, the Government obviously bears a heavy burden in establishing that defense access to witnesses (character or otherwise) was not impeded by command influence to the extent that it affected the results of trial. Indeed, appellate defense counsel might well argue that the Government can never overcome this heavy burden because there will always be a possibility that a witness might have been available who could have tipped the scales in defense's behalf.

In this connection, we draw a distinction between two classes of witnesses (a) character witnesses, and (b) witnesses who will testify on matters other than accused's character. . . .

To satisfy its burden of demonstrating that an accused was not deprived of favorable character witnesses, the Government might elect to proceed in one of several ways. The first would be to show that appellant had offered extensive favorable character evidence at trial, so that it could be inferred that [the commander's] remarks had not inhibited the availability of character witnesses. A second way would be to demonstrate from the accused's military records and otherwise that there simply was no evidence of good character available or that readily available rebuttal evidence of bad character would have been so devastating that, as a tactical matter, the accused could not have afforded the risk of putting his character in evidence. A third way for the Government to meet its burden might be to demonstrate that the prosecution evidence at trial was so overwhelming that there was no way in which the character evidence could have had an effect. This latter alternative

should be used very sparingly, however: First we recognize that character evidence can be very effective in creating reasonable doubt at trial; and, second, we do not wish to create even an appearance of condoning command influence on findings.

22 MJ at 396–97.

19. Mil.R.Evid. 404(a)(1), Manual for Courts–Martial, United States, 1984, permits an accused to offer evidence of a pertinent trait of his or her character so that the factfinder may infer that a person with such a "trait" would not have committed the crime alleged. *See also* Mil.R.Evid. 405(a).[11] Moreover, evidence of a witness' good character for truthfulness may be offered after the witness' "character ... for truthfulness has been attacked by opinion or reputation evidence or otherwise." Mil.R.Evid. 608(a).[12]

■ 20. In dealing with the effect of the unlawful command influence on Gleason's sentence, the Court of Military Review observed that "[u]nder normal circumstances ... soldiers ... would have been standing in line to testify for the appellant" who "had served brilliantly for almost twenty-six years" and "was considered almost God-like by the soldiers in his company." 39 MJ at 783. Although this observation was made with respect to potential testimony in extenuation and mitigation, we do not believe that—absent command influence—these same witnesses would have been any less willing to testify as character witnesses on the merits and to extol Gleason's general good character and truthfulness. Moreover, we are not persuaded beyond a reasonable doubt that the evidence against this "almost God-like" accused was so "overwhelming" that the character evidence could not have generated a reasonable doubt.[13] Under these circum-

stances *Thomas* requires that we set aside the finding that Gleason solicited Mr. Fowler to kill Captain Dumpson.

## IV

■ 21. Our setting aside the finding of guilty to an offense to which appellant pleaded not guilty does not preclude affirmance of a finding of guilty of a lesser-included offense to which he unconditionally pleaded guilty. Even when the conviction of the principal offense is vacated because of unlawful command influence, the plea of guilty and any finding based thereon is untainted.[14] Thus, no legal barrier exists here to affirming findings that Gleason is guilty of soliciting Mr. Fowler to "frame" Captain Dumpson. *See United States v. Cruz,* 25 MJ 326, 329 (CMA 1987).

22. If, however, such a finding is affirmed, a decision must be made between resentencing and reassessment of sentence. The Court of Military Review—after setting aside appellant's conviction for violation of an Army Regulation and concluding that his "sentence was tainted by command influence"—nonetheless undertook a reassessment of sentence. Its premise was that it could "reliably know" that, even if no error had occurred and Gleason had presented in mitigation and extenuation the testimony of every imaginable favorable witness, "no court would have permitted the appellant to serve in any grade other than the lowest enlisted grade." 39 MJ at 783.

23. We need not explore this question further because we have already determined that appellant's conviction of the principal offense—the conviction on which the court below predicated its reassessment of sentence—cannot be affirmed. If, instead, the

---

11. Consistent with the traditional military emphasis on the importance of good character, Mil. R.Evid. 404(a)(1) has been liberally construed to permit evidence of an accused's general "good character." Cf. *United States v. Vandelinder,* 20 MJ 41, 45 (CMA 1985).

12. Gleason testified at trial; and his credibility was in issue.

13. The brief of the *amicus curiae* specifically points out that the loss of potential character

evidence may have prejudiced Gleason. See *Amicus* Brief of Wake Forest University School of Law Clinical Appellate Program at 6–7.

14. *See United States v. Thomas,* 22 MJ at 394–96. Here, as in *Thomas,* "there is no indication that any of [the] command-influence activities were intended to induce guilty pleas." *Id.* at 396. *See United States v. Cruz,* 25 MJ 326, 329 (CMA 1987).

lesser-included offense of solicitation to "frame" Captain Dumpson is substituted,[15] the feasibility of reliably determining what sentence would have been imposed by a court-martial is greatly reduced.

## V

■ 24. The Manual for Courts–Martial provides that—except for the solicitations which are the subject of Article 82 of the Code [16]—the maximum punishment for solicitation of an offense shall be the same as for the offense solicited but in no event greater than 5 years of confinement. *See* para. 105c, Part IV, Manual, *supra.* In this case Gleason pleaded guilty to soliciting Mr. Fowler to incriminate Captain Dumpson falsely.

25. During the providence inquiry at trial, defense counsel stated that he had advised Gleason that the maximum punishment for the lesser-included offense was 4 months' confinement, partial forfeiture, *see* n. 2, *supra,* and reduction to Private E–1. Trial counsel concurred, and the military judge gave the same advice to the accused.[17] Presumably the premise at trial was that the offense solicited would have been a simple disorder for which the maximum punishment is 4 months' confinement. *See* para. 73e (1), Part IV, Manual, *supra.*

26. If the guilty plea is to be relied upon for purposes of upholding a conviction for solicitation of Mr. Fowler to incriminate Captain Dumpson falsely, this Court should proceed on the assumption that no greater punishment can be imposed in resentencing than that of which appellant was advised at trial; otherwise the guilty plea might be attacked as improvident.

27. With this 4–month ceiling on confinement, it becomes even more difficult to determine reliably what sentence might be imposed on Gleason by a court-martial which received extensive evidence of extenuation and mitigation.

28. Taking into account all the circumstances, we are convinced that an appellate court cannot reliably determine what sentence would have been imposed at the trial level if the court-martial had been considering the only offense as to which findings of guilty can be affirmed on the present record. Thus, *United States v. Sales*, 22 MJ 305, 307 (CMA 1986), would require a rehearing on sentence at the trial level.

## VI

29. During oral argument appellate Government counsel was asked whether the Government would wish to retry Gleason for solicitation to commit murder—rather than to conduct further sentencing proceedings on the basis of the lesser-included offense to which he had pleaded guilty. The reason for this question was that the original sentence had not included a punitive discharge, more than 6 years had passed since that sentence had been adjudged, and during the interval appellant apparently had served the confinement that had been imposed.[18]

■ 30. The Government's response was that it wished to retry Gleason for the solicitation to commit murder. In the event of such a retrial the prosecutor will undoubtedly seek to introduce the tape-recording of the meeting that took place between Gleason and Fowler. Appellant insists that the tape of the conversation is inadmissible because of CID noncompliance with Army directives that require coordination with local police authorities when conversations are to be intercepted.

31. We need not inquire whether the language of the applicable directive would apply

---

15. 39 MJ at 779.

16. 10 USC § 882. The four excepted offenses therein are solicitation to desert, to mutiny, to commit misbehavior before the enemy or sedition. *See* para 6b and e, Part IV, Manual for Courts–Martial, United States, 1984.

17. *See* n. 2, *supra.* During oral argument in this Court, the question was posed as to the maximum confinement for the lesser-included offense to which Gleason had pleaded guilty; and appellate government counsel responded that it included 4 months' confinement.

18. The sentence included 7 years of confinement. However, the sentence would be subject to credit for good conduct as a prisoner and also to release on parole.

to the tape-recording by Mr. Fowler of his discussion with Gleason. Even if the directive required coordination with local police authorities before recording a conversation under circumstance such as this, that requirement was not imposed with any intent to benefit persons like appellant whose conversations were being taped. Thus, we agree with the rationale of the Court of Military Review that appellant had no standing to object to the taped conversations because of a lack of coordination with local Thai police authorities. Moreover, the Supreme Court's decision in *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979), seems directly on point against appellant's position. *Accord United States v. McGraner,* 13 MJ 408 (CMA 1982).

## VII

The decision of the United States Army Court of Military Review as to the Charge and its specification and the sentence is reversed. The findings of guilty thereon and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on the charge of solicitation to commit murder with a maximum sentence of confinement for 5 years, total forfeitures, and reduction to E–1 may be ordered.

As an alternative, the convening authority may approve findings of guilty of solicitation to falsely incriminate and discredit Captain Dumpson and order a rehearing on sentence for that offense with a maximum sentence of confinement for 4 months, forfeiture of two-thirds' pay per month for 4 months, and reduction to E–1. If a rehearing on sentence is deemed impracticable, the convening authority may approve a sentence of no punishment.

This decision should be made within 30 days of the date of this decision, unless the Court grants an extension of time. The Court should be promptly advised of whatever decision is made.

Chief Judge SULLIVAN and Judge WISS concur.

Judge CRAWFORD did not participate.

GIERKE, Judge, with whom COX, Judge, joins (dissenting):

32. The majority opinion rests on two unsupportable assumptions: (1) that Sergeant Major (SGM) Gleason would have presented a viable "good soldier" defense if there had been no unlawful command influence, and (2) that Lieutenant Colonel (LTC) Suchke's influence was so great that virtually the entire United States Army was intimidated by him from rallying to SGM Gleason's defense.

33. At trial a good-soldier defense would have been dead on arrival. Gleason's judicial admission that he attempted to obstruct justice by framing his superior commissioned officer was totally at odds with being a "good soldier." Furthermore, "good soldier" evidence on the merits would have opened the door to cross-examination about specific bad acts under Mil.R.Evid. 405(a), Manual for Courts–Martial, United States, 1984, and would likely have been rebutted by "bad soldier" evidence from officers and noncommissioned officers who had a low opinion of Gleason's general character as well as his honesty. Captain (CPT) Dumpson suspected Gleason of submitting false travel vouchers. LTC Suchke suspected Gleason of gun running and drug smuggling. Sergeant First Class Matias believed that Gleason was running guns and drugs and was plotting to kill CPT Dumpson.

34. The majority opinion does not explain how one battalion commander's actions could deprive SGM Gleason of "good soldier" testimony from officers senior to LTC Suchke or witnesses from other battalions and earlier assignments. In his almost 26–year career, Gleason served with distinction in many units. There is nothing in the record to justify the conclusion that he was precluded from putting on a "good soldier" defense through testimony from previous commanders, supervisors, and peers. The majority does not and cannot reconcile its expansive view of LTC Suchke's influence with the fact that a lieutenant colonel, a chief warrant officer, and two sergeants major testified for appellant on sentencing and that a third sergeant major submitted a written statement.

35. In my view, the conclusion is inescapable that appellant would not have presented a "good soldier" defense even in the absence of unlawful command influence. Had the defense desired to risk mounting a "good soldier" defense, they could have presented ample evidence unaffected by LTC Suchke's actions, such as Gleason's many outstanding performance evaluations, awards, and commendations. The defense's failure to present "good soldier" evidence on the merits was plainly a tactical decision, not a response to unlawful command influence.

36. I agree fully with the court below that the findings were unaffected by unlawful command influence. The evidence compellingly established Gleason's guilt. The testimony of Mr. Fowler was corroborated by the letters from Gleason to Fowler and the tape-recorded conversation between Fowler and Gleason. The evidence was further reinforced by Gleason's judicial admission that he plotted with Fowler to harm CPT Dumpson.

37. The record shows that the impact of unlawful command influence was limited to members of appellant's battalion. I will not condone unlawful command influence; however, the court below took more than adequate action to purge the unlawful command influence in this case. I would affirm the decision of the court below. Accordingly, I dissent.